**In re UNITED CHURCH OF THE MINISTERS OF GOD, Debtor.**

**In re Gary Michael HEIDNIK, Debtor.**

**Bankruptcy Nos. 87–01910S, 87–02045S.**

United States Bankruptcy Court, E.D. Pennsylvania.

March 31, 1988.

Leslie B. Baskin, Philadelphia, Pa., trustee/Gary Heidnik.

Robert Szwajkos, Philadelphia, Pa., trustee/United Church of the Ministers of God.

Charles M. Golden, Philadelphia, Pa., for debtor/United Church of the Ministers of God.

A. Charles Peruto, Jr., Philadelphia, Pa., for debtor/Gary Michael Heidnik.

Albert A. Ciardi, Jr., Philadelphia, Pa., for Creditors' Committee.

Judith Brown Chomsky, Philadelphia, Pa., for Betty Heidnik.

Harriet R. Brumberg, Asst. Dist. Atty., Philadelphia, Pa.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The instant bankruptcy cases were filed on April 20, 1987, and April 28, 1987, respectively, by Gary Michael Heidnik, an accused torturer-murderer of several mentally-retarded young women, on behalf of himself and the "church" of which he is self-proclaimed "bishop," apparently formed to maximize tax exemptions. On May 19, 1987, we issued an Opinion, reported at 74 B.R. 271 (Bankr.E.D.Pa.1987), holding that certain state court proceedings which transpired after the voluntary bankruptcy filings and removal of a civil action, brought shortly after Heidnik's arrest, by several of the victims to freeze his considerable assets amounting to a sum in excess of $500,000.00 were voided by the filings here. The result of that Opinion was the appointment of a separate Trustee for the estates of Heidnik individually and of the church.

It is of course not unusual for accused or convicted criminals to seek refuge in our court. However, usually these parties are perpetrators of white-collar or certainly less spectacular crimes than those with which Heidnik is charged. What apparently brings these cases here is the large estate accumulated by Heidnik as a result of shrewd investment of his largely tax-exempt income. In this respect, Heidnik's good fortune held, because all of his investments in the stock market were liquidated by the Trustees prior to Black Monday. The Trustees advise that they will shortly be preparing plans to distribute the funds to the creditors of the estates, including Heidnik's alleged victims.

Presently at issue are various motions pertaining to the use of funds of the estates to finance Heidnik's criminal defense by the attorney defending him in that action, who also filed his individual Chapter 11 case here, A. Charles Peruto, Jr., Esquire. We shall allow Peruto to withdraw from a Stipulation entered into between Heidnik, Peruto, the Trustee, counsel for the church, and counsel for the Creditors' Committee which contemplated Peruto's being compensated solely by receiving one-third of the "entertainment rights" generated by Heidnik or him for "telling Heidnik's story." We shall also grant a motion by the Trustees and the church's counsel seeking to vacate an Order authorizing Heidnik to employ Peruto with funds of his individual estate, which led to the formulation of the Stipulation in issue as a settlement.

The instant sequence of events began when, on August 10, 1987, we granted Heidnik's application to employ Peruto *ex parte*, i.e., without prior notice to other interested counsel, in his individual case. Entry of such orders *ex parte* is a practice which we previously followed, on the theory that a party had a right to name his counsel, and that any irregularities in the appointment could be remedied by denying or reducing the ultimate fee application. We have revised this policy for two reasons. First, we think that, if there are problems with appointment of counsel, the applicant should be made aware of same at the outset, before rendering services which are later found non-compensable. Secondly, we feel that this is a more appropriate response to the directive of the Court of Appeals that we should not even appoint counsel unless counsel is necessary. *See*

*In re Pioneer Sample Book Co.*, 374 F.2d 953, 960–61 (3d Cir.1967). Therefore, entry of such orders *ex parte* is a practice that we have discontinued in all but routine appointments of general counsel for an estate or for the Trustee in an estate warranting same. The developments here reveal the wisdom of that change of policy.

Unknown to us, as same were not brought to our attention, the Trustees had both filed answers opposing this application. On October 30, 1987, they filed a joint motion asking us to reconsider our Order of August 10, 1987. The matter came before us for a hearing, after several continuances, on February 2, 1988. When we expressed our retrospective reservation about the propriety of the entry of the Order of August 10, 1987, the Trustees, Peruto, and counsel for the church, and counsel for the Creditors' Committee indicated a desire to attempt to resolve the matter on some other terms.

Later that day, they reported that, by the use of creative thinking, they had negotiated a settlement. This was embodied in a brief Stipulation filed on February 18, 1988, and executed by the Trustees, all counsel present on February 2, 1988, and Heidnik, by Peruto's power of attorney. The Stipulation provided that Peruto would receive no funds from the present estates of either Heidnik or the church towards Heidnik's criminal defense. Instead, he and Heidnik would assign all entertainment rights to the Debtor-estates; the proceeds of such rights would be placed into interest-bearing accounts; and fifteen (15) days thereafter, one-third of the proceeds would be paid to Peruto, in lieu of other compensation for representation of Heidnik in the criminal proceedings. Not wishing to repeat our error of entering an Order hastily, we requested that notice of the Stipulation and opportunity to object thereto be provided to all interested parties.

Two Objections were filed. One, by Betty Heidnik, Heidnik's estranged wife, contended that the arrangement violated Rule 1.8(d) of the Rules of Professional Conduct, which, effective April 1, 1988, shall super-

sede the Canons of Professional Ethics. The Rule provides as follows:

> (d) Prior to the conclusion of representation of a client, a lawyer shall not make or negotiate an agreement giving the lawyer literary or media rights to a portrayal or account based in substantial part on information relating to the representation.

The other, filed by the Philadelphia District Attorney's office (hereinafter referred to as "the D.A."), contended that the Stipulation impermissibly conflicted with 71 P.S. § 180–7.18, a state law which provides a detailed procedure for distribution of moneys received by persons accused or convicted of crimes and their representatives "with respect to the enactment of such crime" or the "accused or convicted person's thoughts, feelings, opinions or emotions regarding such crime...." 71 P.S. § 180–7.18(a).

Argument on the request of the signatories thereto to approve the Stipulation and the Objections thereto was heard on March 24, 1988. We were advised by Peruto that a resolution prior to the commencement of the state criminal proceedings on April 4, 1988, was necessary to avoid any delay in those proceedings. We therefore directed the parties to file any Briefs supporting their respective positions on or before March 29, 1988.

The proceedings on March 24, 1988, were publicized in the local news media, setting off a new series of Heidnik-related articles. Late in the day on March 25, 1988, we received a letter from Peruto, indicating that he wished to withdraw from the Stipulation. Therein, he stated that he had "entered into the deal ... to make everyone happy" but had since "been literally bombarded with telephone calls" from attorneys critical of his ethics in entering into the agreement. He contended that his withdrawal was justified because his consent had been accompanied by an unexpressed caveat: "if no one objects, I would go with the proposal." The letter concluded by stating that, if the court chose not to give him counsel fees, "I am simply stuck,

but I will not be a party to an unethical agreement."

Although cognizant of this letter, the Trustees nevertheless filed a Brief on March 29, 1988, urging the court to nevertheless approve the Stipulation. Ms. Heidnik and the D.A. filed Briefs opposing same. No other parties filed Briefs.

The first issue is whether the Stipulation can still be considered valid in light of Peruto's attempted withdrawal from it, on behalf of himself and possibly on behalf of Heidnik as well. Most of the caselaw relating to enforceability of stipulations relates to circumstances where parties have entered into factual stipulations prior to trial, and later one of the parties discovers that it has done so in error and seeks to obtain relief therefrom. The principles of law pertinent to such circumstances are well-stated in a district court Opinion written by present Circuit Judge Edward R. Becker in *United States v. Kulp*, 365 F.Supp. 747, 763 (E.D.Pa.1973), *aff'd*, 497 F.2d 921, 922 (3d Cir.1974). Although finding that such stipulations are generally enforceable, Judge Becker held that

> [a] court may allow a party to withdraw from a stipulation if the moving party can prove that he relied to this detriment on representations that were untrue, or that the stipulation stemmed from fraud, accident, mistake, inadvertence, surprise, or excusable neglect, or that some other reason justifies relief. *See Norwich Pharmacal Co. v. Rakway, Inc.,* 189 F.Supp. 348 (E.D.Pa.1960); *Rarick v. United Steelworkers of America,* 202 F.Supp. 902 (W.D.Pa.1962).

*See also, e.g., United States v. Camp,* 723 F.2d 741, 745–46 (9th Cir.1984); *Coastal States Marketing, Inc. v. Hunt,* 694 F.2d 1358, 1369 (5th Cir.1983); *Jacintoport Corp. v. Greater Baton Rouge Port Comm'n,* 599 F.Supp. 21, 23 (M.D.La.1984), *rev'd on other grounds,* 762 F.2d 435 (5th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986); and *Albee Homes, Inc. v. Lutman,* 274 F.Supp. 875, 877 (E.D.Pa.1967), *aff'd in part and appeal dismissed in part,* 406 F.2d 11 (3d Cir.1969).

The principle underlying the refusal to give a stipulating party relief from same is based upon the unfairness to the other stipulating party, who was otherwise entitled to rely on its contents. We believe that these considerations are diminished in the instant setting. The Trustees and other parties entering into the Stipulation obviously did so to avoid the necessity of the court's deciding the Motion to reconsider the Order of August 10, 1987. However, there is no indication that the Trustees were unfairly prejudiced in presenting their Motion to reconsider by entering into the Stipulation. In fact, as indicated below, they are entitled to prevail on their motion in any event.

Moreover, the Stipulation was shrouded in the contingency that it would not meet with court approval from the outset. This court clearly declined from indicating that it would approve the Stipulation when its proposed contents were described by the parties on February 2, 1988. The court required that all interested parties be sent notice of it and be permitted to express objections to it before we would approve it. Objections which bore significant substance were raised by interested parties. Upon consideration of these Objections, Peruto expressed personal concern that the Stipulation might be unethical.

Under these circumstances, we think that there are sufficient "reasons" to grant Peruto relief from the Stipulation, in the context recited by Judge Becker in *Kulp* as justification for such relief. We have no doubt that Peruto's attempt to withdraw the Stipulation is based upon the purest of motives, *i.e.,* an intention to not do the wrong thing ethically even if his disavowal works to his personal detriment, as this Opinion indicates it may well. We do not perceive any attempt by Peruto to extricate himself from the Stipulation to better serve his personal ends, like, for example, getting more than one-third of the putative "entertainment rights." Rather, his own expressed reasons for seeking withdrawal appear to express a tacit admission that any sort of contract with Heidnik whereby he

would receive compensation for entertainment rights would be unethical.

Therefore, we conclude that Peruto's withdrawal from the Stipulation is valid and that, as a result, the issue of whether we should approve the Stipulation is moot. The Stipulation is, therefore, in our view, no longer on the table and is incapable of approval.[1]

1. This disposition avoids our having to consider the merits of the Objections raised by Ms. Heidnik and the D.A. We have little doubt that the Objections by the D.A., based on 71 P.S. § 180-7.18, would have not proved to have been a difficult hurdle. The Stipulation was far broader than 71 P.S. § 180-7.18(a). The latter includes only "reenactment" of crimes and "expressions" of the accused's feelings, opinions, and emotions regarding the crime. The Stipulation would have covered *any* entertainment rights possibly collectible by Heidnik. Therefore, it is quite likely that the Stipulation would have brought funds into the estate which could not have been touched under the terms of the state statute.

There is no basic conflict between the state statute and the Stipulation. Both contemplate that the victims would be the primary beneficiaries of any entertainment rights realized by Heidnik, as they properly should be. Both, however, in recognition of the accused's sixth amendment rights, carve out a portion of the proceeds of entertainment rights for the defense of the accused. In fact, the statute is arguably more generous to the accused, per 71 P.S. § 180-7.18(f), than the Stipulation would have been. As long as the accused is able to show that funds "shall be used for the exclusive purpose of retaining legal representation at any stage of the proceedings against such person," including appeals and costs for witness fees and attorney's fees, the accused is apparently entitled to such funds. *Id.* In fact, there is no limit nor apparent discretion accorded to the court to restrict unreasonable expenditures for defense, and the accused could conceivably exhaust the entire fund, no matter how large, for his defense. The Stipulation at least put limits on the amounts expended for counsel fees. It also contemplated elimination of the five-year waiting period for distribution of funds escrowed from entertainment rights, a delay which would hardly have benefited the victims.

In sum, the Stipulation enhanced the rights of the victims without incorporating the apparent loopholes and drawbacks of 71 P.S. § 180-7.18. Since the Stipulation furthered state policy, we perceive no conflict with state law. It is apparent in any event, that bankruptcy law controls the distribution of property of the Debtors' estates. The Stipulation resolved in favor of the estates the possibly problematical issue of whether proceeds from post-petition entertainment rights would be property of the estates. The argument of the D.A. that P.S. § 180-7.18 barred the enforcement of the Stipulation appears misplaced, both as a matter of law and as a matter of social policy. It appears that the Stipulation could have only enhanced the victims' rights, and it is somewhat dismaying to note that the D.A. opposed a measure which would have benefited the victims.

The Objection of Ms. Heidnik, based upon ethical considerations, constituted a more serious objection, and apparently it was these considerations which caused Peruto to seek to withdraw from the Stipulation. The above-quoted provisions of the Rules of Professional Conduct, which are mirrored in Disciplinary Rule 5-104(B) of the presently-effective Code of Professional Responsibility, appear to unconditionally prohibit an attorney from entering any contract with a client whereby the attorney's compensation is derived from publication rights with respect to the matter in which he is employed. At the outset, we observe that rules governing professional conduct do not have the force of establishing substantive law. *See In re Tigue, Tigue v. Steger,* 82 B.R. 724, 734 (Bankr.E.D.Pa. 1988); and *In re Estate of Pedrick,* 505 Pa. 530, 535, 482 A.2d 215, 217 (1984). However, as our *Tigue* result indicates, they are a powerful force which certainly merit our careful consideration. *Id.,* at 732-34.

Our research reveals that the purpose of the prohibition on this sort of contract is that it creates a conflict of interests in the attorney between enhancing his pocket book by heightening the spectacle and hence the "entertainment value" of the trial at the expense of the effective defense of the criminal defendant, which is often best served by having the accused remain unspectacularly silent. *See,* Annot., *Circumstances Giving Rise to Prejudicial Conflict of Interests Between Counsel—State Cases,* 18 A.L.R.4th 360, 496-98 (1982). The fact that criminal defense counsel has entered into such a contract may give rise to a claim of ineffective counsel. *People v. Corona,* 80 Cal.App.3d 684, 145 Cal. Rptr. 894 (1978). On the other hand, claims of ineffective counsel have been rejected in other circumstances, the most notable of which was F. Lee Bailey's placing Patricia Hearst on the witness stand, which Hearst's subsequent counsel claimed was merely to enhance the value of Bailey's contract to write a book about the trial rather than assist Hearst's defense. *See United States v. Hearst,* 638 F.2d 1190 (9th Cir.1981). *See also, e.g., Wojtowicz v. United States,* 550 F.2d 786, 793 (2nd Cir.1977); *Ray v. Rose,* 535 F.2d 966, 975 (6th Cir.1976); and *Stafford v. State,* 697 P.2d 165, 167-68 (Okla.Cr.App.1985). On the other hand, if the accused knowingly, voluntarily, and intelligently enters into a contract to allow chosen counsel to receive compensation from "entertainment rights," it is not clear that the purpose behind the prohibition of such contracts is served. Annot., *supra,* at 511-14. The most dramatic case on this point is

■ Having determined, for better or for worse, that the approval of the Stipulation is a moot point, we are placed back at the position where we stood prior to the introduction of the Stipulation on February 2, 1988. Our duty is deciding the relatively simple issue of the merits of the Trustees' motion to reconsider our Order of August 10, 1987, appointing Peruto as Heidnik's counsel in order that he could be compensated from estate funds for providing representation in the criminal proceedings. Unfortunately for Peruto, we must grant the Trustees' motion.

The most recent and thorough discussion of this issue is contained in *In re Duque,* 48 B.R. 965 (S.D.Fla.1984), in which a district court reversed one of the few reported decisions in which a bankruptcy court had allowed special criminal counsel of the debtor to be compensated out of estate funds. Refusing to follow blindly several earlier bankruptcy court decisions which appeared to dismiss such requests out of hand, *e.g., In re Delk,* 27 B.R. 86, 87 (Bankr.W.D.Okla.1983); and *In re Pajarito American Indian Art, Inc.,* 11 B.R. 807, 811 (Bankr.D.Ariz.1981), the *Duque* court introduced a three-step reasoning process. 48 B.R. at 974–75. First, it reasoned that employment of counsel, under 11 U.S.C. § 327(a), must be in the best interests of the estate. To meet this requirement,

> There must be an actual need for the services, based upon a threat to the estate or its property. The threat must be actual and real, not some hypothetical or speculative benefit which may or may not be realized. *Id.*

Secondly, the court emphasizes that criminal counsel "must be for the estate and not for the personal benefit of the debtor's rights." *Id.* at 975. Finally, it points out that "potential violations of the debtor's

constitutional rights posed by criminal investigations or prosecutions occurring after the filing are of concern to the criminal forum, not the bankruptcy court." *Id.* Similar reasoning is expressed by the other leading decisions, *Official Committee of Disputed Litigation Creditors v. McDonald Investments, Inc.,* 42 B.R. 981, 984–87 (N.D.Tex.1984) (also a reversal of a bankruptcy court order allowing appointment of counsel to defend a criminal matter); and *In re Tashof,* 33 B.R. 225, 227–29 (Bankr.D.Md.1983).

We fail to discern the presence of any "actual and real" threat to the proceeds of these estates which will be affected by the criminal proceedings against Heidnik, irrespective of their outcome. The only hypothesized benefits to the estates articulated on February 2, 1988, were that Heidnik talked only to Peruto and therefore lines of communication between the Debtor and the Trustees would be cut off. We fail to see the need for the Trustees to have such communication in order to perform their administrative duties of distributing the estates' assets. This court need not concern itself with currying favor from Heidnik.

The foregoing cases, *Duque, McDonald,* and *Tashof,* all involved debtors charged with fraud. The courts recognized that the outcome of the criminal proceedings in issue there could conceivably have had at least some collateral estoppel effect in the litigation of the claims against the respective debtors' estates or could have depleted estate assets. Here, even no such considerations are present. The criminal proceedings have at best a tenuous connection with preservation of the assets of the estates. Thus, we find insufficient evidence that the needs of the estates would be

*Maxwell v. Superior Court,* 30 Cal.3d 606, 639 P.2d 248, 180 Cal.Rptr. 177 (1982), where the Supreme Court of California, with only one dissent, held that a recusal of chosen counsel on the basis of such a contract conflicted with the defendant's sixth amendment rights.

In sum, this was a close and difficult question. We are somewhat at a loss as to why Ms. Heidnik would express concern at a conflict which would operate to the apparent detriment of only

Heidnik himself. It would seem, ironically, that this would be an argument which the D.A. would have taken up, as arguably the Stipulation could have provided a built-in claim of ineffective counsel.

It is difficult to see what benefit any of the claimants against the estate would gain by opposing the Stipulation. Hence, the Trustees appeared to be doing their duty well in proposing this Stipulation.

served by Peruto's representation of Heidnik in the criminal proceedings.

The second considerations cited by the *Duque* court goes to the timing of the "criminal transgressions." The *Duque* court suggests that post-petition activity is of far more concern to the estate than pre-petition activity, and that appointment of counsel to defend post-petition activities is more easily defensible. Here, the conduct for which representation is sought was exclusively pre-petition. Heidnik was incarcerated prior to the filing.

The third topic addressed by the *Duque* court is the potential that the accused debtor will be shorn of financial resources to pay his counsel and thus that the bankruptcy court, by denying the accused debtor counsel, will be a party to deprivation of the debtor's constitutional rights. Although Heidnik may be able to assert this same sort of argument, the *Duque* court declines to consider this element. We do note here that, for richer or for poorer, Peruto has entered his appearance for Heidnik. Thus, Heidnik will have his chosen counsel unless and until the state court allows Peruto to withdraw. Furthermore, it seems apparent that the state will be compelled to appoint counsel and compensate same. We can only note the irony of the fact that the Trustees proposed a solution that contemplated no state expenditures for criminal defense, and that one of the objecting parties was a public official, i.e., the D.A.

However, it is clear to us that we have no choice, given the elimination of the alternative presented by the Stipulation, to granting the Trustees' motion, vacating our Order of August 10, 1987, declining Peruto's request to be compensated from estate funds, and requiring the state courts to resolve the problem of protecting Heidnik's constitutional rights. An Order so directing will be entered.

## ORDER

AND NOW, this 31st day of March, 1988, after hearing argument from interested counsel at the hearing to consider a Stipulation in the above matters relevant to the respresentation of the individual Debtor by A. Charles Peruto, Jr., Esquire, (hereinafter referred to as "Peruto") and Objections thereto by counsel for Betty Heidnik and the Philadelphia District Attorney's Office, and considering the Trustees' Joint Motion for Reconsideration of our Order of August 10, 1987, appointing Peruto to represent the individual Debtor in his criminal proceedings, it is hereby ORDERED as follows:

1. Due to Peruto's withdrawal from same, the request to approve the Stipulation is DENIED.

2. The Trustees' Motion is GRANTED, and our Order of August 10, 1987, appointing Peruto to represent the individual Debtor in his criminal defense is VACATED. No expenditures of estate funds will be allowed for the purpose of funding the criminal defense of the individual Debtor.