**In re Pena CUASCUT, Debtor.**

**Bankruptcy No. 85–00578S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 27, 1988.

Gary D. Bressler, Tammi J. Lipsky, Philadelphia, Pa., for Ajax Philadelphia, Inc.

Stephen Raslavich, Philadelphia, Pa., interim trustee.

Jeffrey V. Matteo, Philadelphia, Pa., for debtor.

## MEMORANDUM

DAVID A. SCHOLL, Bankruptcy Judge.

This disturbing little matter came to draw our full attention on September 15, 1988, when an entity known as AJAX PHILADELPHIA, INC. (hereinafter referred to as "Ajax") relisted for hearing what it designated as a Motion to Enforce

**14**

Stipulation, for Contempt of Court, and for Punitive Damages (hereinafter "the Contempt Motion"), against the Debtor, PENA CUASCUT. Ajax had originally filed the Contempt Motion in this case on March 30, 1988, subsequent to our reopening this Chapter 7 case on previous motion of Ajax on March 16, 1988. We regret that we have only the docket entries; the pleadings filed during 1988; and the testimony and arguments of counsel at the hearing to piece together the history of this matter.

The Debtor filed a Chapter 13 bankruptcy case on February 19, 1985, and converted it to a Chapter 7 case on August 6, 1985. On November 19, 1985, the Debtor filed a motion to avoid certain judicial liens of Ajax. The resolution of this motion was a Stipulation executed by the Debtor, as well as both her counsel and counsel for Ajax, approved by our predecessor, the Honorable William A. King, Jr., on February 5, 1986 (hereinafter "the Stipulation"). Pursuant to the Stipulation, the Debtor agreed to pay Ajax the total sum of $2,500.00 in monthly installments of $40.00, beginning June 1, 1986, and increasing by $10.00 monthly each June 1 thereafter until the full amount of $2,500.00 was paid. On May 14, 1986, a Discharge Order was entered and the case was closed. The Contempt Motion alleged that, thereafter, the Debtor had made only one $40.00 payment, and requested that we hold her in contempt, order her to pay the $940.00 sum allegedly in default, and award Ajax punitive damages, costs, and attorney's fees.

After several continuances, we entered an Order of May 26, 1988, requiring that the matter not be continued further and be heard on June 9, 1988. It was reported settled at that time. However, no document evidencing that settlement ever appeared.[1] Thereafter, it was relisted by Ajax on September 15, 1988.

In the course of the hearing, we learned that another Stipulation, to resolve the present controversy (hereinafter "the New Stipulation"), had been executed by the Debtor; her son-in-law, Jackie Jackson (hereinafter "Jackson"); and both parties' counsel. The New Stipulation recited that a $350.00 payment by Jackson had been made and included an agreement by the Debtor and Jackson to pay $172.00 monthly from July, 1988, through November, 1988, or a total of $1,250.00 in full satisfaction of the obligation. Apparently, the Debtor had not remitted the $172.00 monthly payments in July, 1988, or in the subsequent months, thus bringing the matter before the court on the request of Ajax to compel the Debtor to pay the sums called for in the New Stipulation.

The only witness at the hearing was the Debtor. She testified, and verified by her extreme difficulty in ambulating, that she was totally disabled and that her only income was (1) Supplementary Security Income (hereinafter "SSI") disability benefits of $330.00 monthly; (2) Welfare benefits received on account of her dependents, a disabled teenaged grandson, a teenaged granddaughter, and the latter's three-month-old baby; and (3) Income from sporadic babysitting of other children ("when they were brought to her"). Not surprisingly, giving this very low income, the Debtor testified that her expenses for food, utilities, and real estate taxes, let alone other necessities, exceeded her income and prevented her from making payments to Ajax.

The underlying obligation to Ajax was apparently incurred by Jackson, in connection with a lease of equipment for a long-abandoned venture to operate a restaurant. The Debtor firmly denied that she had ever signed this lease, and hypothesized that she was liable solely because Jackson was related to her. Indeed, Jackson and his wife, one of the Debtor's daughters (not the mother of the grandchildren living with her), continued to live with (and off) her in her home. Although both counsel urged us to approve the New Stipulation, the Debtor disavowed it, stating that she could not make the payments. Believing the Debt-

---

1. Pursuant to Local Rule 7041.2, effective July 1, 1988, this sequence of events could now result in dismissal of the Contempt Motion for failure to file a requisite Stipulation within thirty (30) days after an announced settlement.

or's assessment of her capability to make the payments to undoubtedly be correct, we indicated our refusal to approve it.

■ Initially, foremost among our concerns was the propriety of Ajax's invoking our jurisdiction by moving to reopen this case to enforce post-petition conduct long after the case was closed. Once a Chapter 7 case is closed, the court generally retains jurisdiction over only disputes which clearly involve property of the estate. *See In re Bobroff,* 766 F.2d 797, 802–04 (3d Cir.1985); and *In re Reed, Reed v. Philadelphia Housing Authority,* Bankr. No. 87–05630F, Adv. No. 88–0632F, slip op. at 4–9 (Bankr.E.D.Pa. Sept. 21, 1988). It is unclear whether this controversy involves property of the estate. Nevertheless, we have ultimately concluded that it is fortuitous that Ajax did invoke our jurisdiction, because this circumstance allows us to reimpose the stay which the bankruptcy case previously had effected automatically as to Ajax. *See* 11 U.S.C. § 362(c)(2)(C) (automatic stay terminates at date of discharge). We believe that it is necessary for us to do so to prevent the perpetuation of possible violations of the Bankruptcy Code and injustice in this matter. See page 16 *infra.*

■ The Motion seeks to invoke the contempt power of this court. Invocation of this power here appears ill-chosen, for several reasons. First, as we indicated in our recent Opinion in *In re Clark, Williams et al. v. Clark,* 91 B.R. 324, 337–41 (Bankr. E.D.Pa.1988), monetary sanctions imposed against *debtors* for civil contempt, if granted at all, must be narrowly drawn and carefully administered. In *Clark,* we did impose such penalties, but the penalties imposed upon the Debtor, who egregiously violated several of our Orders and seriously endangered the safety and welfare of several impoverished tenants and their young children, were very mild, given the circumstances. Here, it is the Debtor and the safety and welfare of children under *her* care which draws our attention. Thus, most of the equities, here, favor the Debt-

or; whereas, in *Clark,* the equities were quite strongly *against* the Debtor. We would, therefore be disciplined to impose any but the mildest penalties against the Debtor even if we found her in contempt of our Orders here.

■ Secondly, there is considerable question whether contempt is ever an appropriate means of enforcing what is strictly a monetary judgment or order. *See Combs v. Ryan's Coal Co.,* 785 F.2d 970, 980 (11th Cir.1986) ("when a party fails to satisfy a court-imposed money judgment the appropriate remedy is a writ of execution, not a finding of civil contempt"); and *Dunlop v. Fisher,* 406 F.Supp. 760, 761 (D.Colo.1976). Only in limited circumstances, where all due protections are accorded to the contemnor, should a judgment creditor ever be permitted "to parlay a settlement agreement" into a contempt citation. *Klein v. Ziegler,* 82 B.R. 345, 346 (E.D.Pa.1988) (per FULLAM, CH. J.). *See Lichtenstein v. Lichtenstein,* 425 F.2d 1111 (3d Cir.1970) (court vacates contempt order lacking specificity, definiteness, and facts supporting its reasonability).

Thirdly, "[t]he law is well-established that financial impossibility is a valid defense to charges of civil contempt; ..." *O'Leary v. Moyer's Landfill, Inc.,* 536 F.Supp. 218, 219 (E.D.Pa.1982) (per POLLAK, J.). *See also, e.g., United States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983); *Maggio v. Zeitz,* 333 U.S. 56, 69–77, 68 S.Ct. 401, 408–13, 92 L.Ed. 476 (1948); *Newman v. Graddick,* 740 F.2d 1513, 1528 (11th Cir. 1984); and *Halderman v. Pennhurst State School & Hosp.,* 673 F.2d 628, 638–39 (3d Cir.1982), *cert. denied,* 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984).

■ All of these concerns coalesce here. The Debtor has been and plainly continues to be financially incapable of honoring the terms of the Stipulation, despite her intention to abide by it, which, per the cases cited in the immediately preceding paragraph, is a complete defense to the motion. If Ajax could overcome that hurdle, and we hold that it cannot, we would nevertheless be unlikely to exercise our limited power to

impose a contempt sanction against a debtor for a failure only to pay a monetary sum, even if a payment called for in a court-approved stipulation.

Consideration of the future of the relationship between Ajax and the Debtor has caused us to rethink our initial impression that Ajax's return to the jurisdiction of this court was ill-conceived. The Stipulation approved by this court on February 5, 1986, while having some of the trappings of a reaffirmation agreement, does not in fact contain the requisite notice of a rescission right nor an affidavit of the Debtor's counsel that the agreement is voluntary and does not impose a financial hardship on the Debtor. See 11 U.S.C. §§ 524(c)(2), (c)(3)(A), (c)(3)(B). Therefore, the Debtor's obligation to Ajax, except as this court will enforce the Stipulation, is discharged. See 3 COLLIER ON BANKRUPTCY, ¶ 524.03, at 524–19 to 524–20. A motion to enforce this stipulation may thus be the only mechanism to enforce any rights against the Debtor which is left to Ajax.

■ It is clear that we have the power to decline approval of any stipulation presented to us, even if same is duly executed by all of the parties. See *United States v. Miller*, 588 F.2d 1256, 1264 (9th Cir.1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); and *In re Roblin Industries, Inc.*, 52 B.R. 241, 143 (Bankr.W. D.N.Y.1985). The Debtor's execution of the New Stipulation does not preclude our declining to approve and enforce it in light of the debtor's extremely reasonable disavowal of it. See *In re United Church of the Ministers of God*, 84 B.R. 50, 53–54 (Bankr.E.D.Pa.1988).

Moreover, given the relevations at the hearing of September 15, 1988, we would be more receptive to an application that the Debtor be relieved from the Stipulation of February 5, 1986, than to a request that the New Stipulation be approved. See *United States v. Kulp*, 365 F.Supp. 747, 763 (E.D.Pa.1973), *aff'd*, 497 F.2d 922 (3d Cir.1974) (per BECKER, J.) ("fraud, accident, mistake, misadventence, surprise, or excusable neglect, or ... some other reason" may justify relief from a stipulation).

■ We also ponder the policy of enforcing the validity of a Stipulation which, in substance, is a reaffirmation agreement which fails to include the requisite elements of such an agreement, *i.e.*, a right to rescind and counsel's affidavit that the agreement was entered into voluntarily and would not impose financial hardship on the Debtor and her dependents. See 11 U.S.C. §§ 524(c)(2), (c)(3)(A), (c)(3)(B). This absence of the formality of a reaffirmation agreement is exacerbated by our belief that the Stipulation *did* impose an undue financial hardship on this Debtor and that its voluntariness and wisdom were questionable. We further query whether the failure to give the right to rescind the agreement would not toll the 60–day period until such notice is given, *i.e.*, to date, permitting a rescission at present. *Cf.* 15 U.S.C. § 1635(a); and 73 P.S. § 201–7(e) (rescission period does not run until notice of rescission rights is provided). Finally, a failure to utilize the reaffirmation procedure and an attempt, even innocently, to circumvent same may be punishable by the invalidation of any security interest held by a creditor. See *In re Kendrick*, 75 B.R. 451, 455–56 (Bankr.N.D.Ga.1987).

We believe that these concerns about the legality of any efforts of Ajax to enforce the Stipulation or its rights generally against the Debtor justify our re-imposition of the stay, at least as to Ajax. See *In re Kanuika*, 76 B.R. 473, 476–78 (Bankr.E.D. Pa.1987); *In re Brusich & St. Pedro's Jewelers, Inc.*, 28 B.R. 545, 549 (Bankr.E.D.Pa. 1983); and *In re Durkalec*, 21 B.R. 618, 619–20 (Bankr.E.D.Pa.1982). We therefore add such a provision to our accompanying order.

Much of our assessment of the Debtor's options is, if course, speculative, because we do not have the entire file before us. The Debtor's counsel advised that, despite the Debtor's statement to the contrary, the lease with Ajax which is at the root of this problem was in fact signed by the Debtor. However, no degree of speculation is involved in our reaching the conclusion that it ill befits a bankruptcy court to collabo-

rate in shackling a debtor with overwhelming financial responsibilities.

We will therefore enter an Order denying the Contempt Motion, declining to approve the New Stipulation, and reimposing the automatic stay pending any further developments.