In re: William **ENGEL**, Debtor.

**FERRARA & HANTMAN; Robert J. Hantman,** Appellants,

v.

**Jesus Antonio ALVAREZ; Theodore J. Liscinski, Jr.,** Trustee; **United States Trustee.**

No. 96–5256.

United States Court of Appeals, Third Circuit.

Argued Nov. 7, 1996.

Decided Sept. 3, 1997.

Michael R. Perle (argued), Michael R. Perle, P.C., New York City.

Robert J. Hantman, Hantman & Associates, New York City, for Appellants.

David A. Nicolette (argued), Jeanette A. Odynski, Nicolette & Perkins, Oradell, NJ, for Appellee, Jesus Antonio Alvarez, as Administrator ad Prosequendum and as Administrator of the Estate of Xiomara Alvarez, also known as Xiomara Engel, Deceased.

Theodore J. Liscinski, Jr., Lanfrit, Liscinski & Rosenwasser, P.C., Somerset, NJ, for Appellee, Trustee, Theodore J. Liscinski.

Before: BECKER, McKEE and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge:

The question we must answer on this appeal is whether an appointment of special counsel under § 327(e) of the Bankruptcy Code requires that compensation for special counsel's services be paid from estate funds where no benefit to the bankruptcy estate has been achieved. We hold that § 330 of the Bankruptcy Code requires that services rendered by special counsel benefit the estate before payment from estate funds may be authorized. Hence, we affirm the district court's order, which had affirmed the bankruptcy court's order denying compensation to special counsel.

## I.

In 1985 William Engel was convicted of the murder of his former wife, Xiomara Alvarez.[1] The New Jersey Superior Court upheld his conviction, noting that "the voluminous trial record fairly reeks of defendants' guilt."[2] In 1986, Jesus Antonio Alvarez, the Administrator of the estate of Xiomara Alvarez, filed a wrongful death action against Engel.

---

1. William and his brother Herbert were arrested and charged with the contract murder of Xiomara. Both were subsequently tried, convicted, and sentenced to life imprisonment. Herbert died in prison.

2. *State v. Engel*, 249 N.J.Super. 336, 592 A.2d 572, 577 (App.Div.), *cert. denied*, 130 N.J. 393, 614 A.2d 616 (1991).

In 1992, Engel settled a dispute over his interest in a partnership with another brother, Richard. Pursuant to that settlement, William Engel is to be paid more than $5 million, payable in monthly installments of approximately $43,000, with a balloon payment of $4.2 million in the year 2004. He is also to receive $1 million in monthly installments of $16,666.66.

Engel's liability in the wrongful death action was established in April 1993.

Late in 1993, in the hopes of securing post-conviction relief from his conviction for murder, Engel sought the services of Robert Hantman, of the law firm Ferrara & Hantman.[3] On January 6, 1994, Engel filed for Chapter 11 bankruptcy, retaining the firm of Wasserman, Jurista & Stolz (Wasserman) as counsel for Engel as debtor-in-possession.

On March 21, 1994, when the issue of Hantman's retention was first raised by Jurista of the Wasserman firm, the bankruptcy court warned that criminal defense services would not be payable from the estate.

On April 13, 1994, debtor-in-possession Engel applied through Wasserman, for bankruptcy court approval of his retention of Hantman as special counsel. On April 14, 1994, David A. Nicolette, attorney for the Alvarez estate, wrote to the bankruptcy court objecting to Hantman's proposed retention. He argued that the criminal defense services that Hantman would perform would benefit Engel personally, but not the bankruptcy estate. He contended that estate funds could not be used to pay for such criminal defense services. He also reminded the bankruptcy court of the warning given on March 21, 1994.

On April 19, 1994, Hantman reviewed Nicolette's objections.

On May 16, 1994, the bankruptcy court held a telephone conference to discuss the proposed retention of Hantman and the objections raised by Nicolette. Yablonsky of the Wasserman firm, and Nicolette, on behalf of the Alvarez estate, participated in the conference call.

The next day, on May 17, 1994, the bankruptcy court issued an order approving of the retention of Hantman as special counsel. The May 17 Order reads in pertinent part:

It is, on this 17th day of May, 1994,

Ordered, that the Debtor's proposed retention of the law firm of Ferrara and Hantman, 920 Bergen Avenue, Trust Company Building, Suite 806, Jersey City, New Jersey, as special counsel herein, be and the same is hereby approved; and it is further **Ordered, that compensation to such special counsel shall be determined by this Court upon proper application.**

Order May 17, 1994 (emphasis added).

In May 1994 Engel paid a retainer of $30,000 from the estate to Hantman. In September 1994, after discovering that the payment had been made, the Alvarez estate filed a motion to compel Hantman to disgorge the retainer. Subsequent to an October 13, 1994 hearing on the disgorgement motion, the bankruptcy court ordered Hantman to disgorge the retainer on October 31, 1994. Engel appealed the order to the district court, and the district court affirmed the order of the bankruptcy court.

On May 31, 1995, Hantman filed his first interim fee application for services provided as special counsel in Engel's criminal case. The application sought fees in the amount of $258,667.00, and costs in the amount of $32,791.33.

In July 1995, more than one year after Hantman sought to be retained as special counsel for Engel, Engel's liability in the wrongful death action was established at $5.154 million. On March 15, 1996, the New Jersey Superior Court denied Engel's petition for post-conviction relief and his motion for a new trial.

After holding a hearing on September 6, 1995 on Hantman's fee application, the bankruptcy court found that the services which Hantman had provided in Engel's criminal case had provided no benefit to the bankruptcy estate, and could not, therefore, be paid from estate funds. Hantman filed a motion for reconsideration, which was like-

---

**3.** When the notice of appeal was filed, Robert J. Hantman was a principal in the law firm of Ferrara & Hantman. However, the law firm no longer exists. Appellants' Br. at 4.

wise denied by the bankruptcy court. On December 20, 1995, the bankruptcy court issued opinions on the denial of fees and the motion for reconsideration, and on the following day, December 21, 1995, entered an order denying Hantman's fee request. Hantman appealed that denial to the district court, which affirmed the December 21, 1995 order of the bankruptcy court on April 17, 1996.

Hantman appeals from the April 17, 1996 order of the district court. This court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(d).

▪ Our review of the district court's disposition is plenary. The bankruptcy court's legal interpretations are subject to plenary review, the factual findings of the bankruptcy court are reviewed for clear error, and the bankruptcy court's decisions regarding the awarding of fees are reviewed for abuse of discretion. *Zolfo, Cooper & Co. v. Sunbeam–Oster Co.,* 50 F.3d 253, 257 (3d Cir.1995).

## II.

### A.

The essence of Hantman's argument on appeal is that "an order under § 327(e) establishes a legal right to be paid from the estate."[4] He argues that it is implicit in the appointment of special counsel that there is a "benefit-to-the-estate."

▪ We reject Hantman's argument, and hold that an order approving of a profession-

al's retention under § 327 does not establish a right to be paid from the bankruptcy estate under § 330. Approval under § 327 establishes only that an attorney *may be employed* by the debtor in-possession,[5] and not that his employment will therefore or thereafter be compensated from estate funds. Compensation from the estate, as we discuss *infra,* depends on the second look taken by the bankruptcy court as mandated by § 330, for a determination of "benefit-to-the-estate."

▪ Any debtor-in-possession—in this case Engel—must receive court approval in order to employ an attorney or other professional. Otherwise he is not permitted or authorized to retain counsel. This is true regardless of the source of compensation for the attorney so engaged. An attorney whose employment is approved under § 327 enjoys no presumption that his compensation will be paid from the estate under § 330. Even if compensation is to come from some source other than the estate, employment of an attorney by the debtor-in-possession must still be approved by the bankruptcy court.[6] An attorney whose employment has not been approved under § 327 can be required to return compensation for the services provided to the debtor-in-possession,[7] *even though they were paid by third parties and not by the estate.*[8]

▪ A bankruptcy court, even though it has approved employment under § 327, must once again review any application for compensation. The text of the statute makes this clear. This review must be made under

**4.** Appellant's Br. at 39.

**5.** Section 327(e) provides that the "trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate...." 11 U.S.C. § 327(e) (West 1993).

**6.** *In re Peterson,* 163 B.R. 665, 670 (Bankr.D.Conn.1994)(attorney representing debtor must receive court approval under § 327, even though not seeking compensation from estate; attorney must file employment application even if not required to file fee application); *Land v. First Nat'l Bank (In re Land),* 116 B.R. 798, 804–05 (D.Colo.1990)(rejecting claim "that court approval of an attorney's employment [by debtor-

in-possession] is not required when his fees are paid by third parties and do not come from funds belonging to the estate."), *aff'd,* 943 F.2d 1265 (10th Cir.1991); *In re Rheuban,* 121 B.R. 368, 385 (Bankr.C.D.Cal.1990)(attorney providing legal services to debtor as debtor-in-possession, even if he does not intend to seek compensation from the estate, must obtain court approval under § 327).

**7.** *In re Prime Foods of St. Croix, Inc.,* 80 B.R. 758, 761 (D.V.I.1987); *Willis v. Cruse (In re Samford),* 125 B.R. 230, 233 (E.D.Mo.1991).

**8.** *Land v. First Nat'l Bank (In re Land),* 943 F.2d 1265, 1267 (10th Cir.1991)(return of compensation received from debtor-in-possession's family members appropriate remedy for failure to obtain court approval of employment).

§ 330, when the estate has been benefited and is to pay for the beneficial services, and under § 329 when compensation is to come from some source outside the estate. Section 330 provides that after "notice to any parties in interest and to the United States trustee and a hearing ... the court *may* award ... to a professional person employed under section 327 ... reasonable compensation for actual, necessary services rendered,"[9] and which *benefit the estate.*[10] In the case of compensation which is to come from some *non-* estate source, the determination would be made solely under § 329, which empowers the court to review any compensation arrangement between a debtor and an attorney.[11]

We have consistently rejected the contention that compensation from the estate under § 330 and approval under § 327 can be compressed into one step, and we have upheld scrutiny under § 330 as the mandatory second part of a two-step process. Thus, in *In re Arkansas Company, Inc.,* 798 F.2d 645, 648–49 (3d Cir.1986), we rejected "the notion that a complete and thorough post-application review may substitute for prior approval in most cases. This approach [i.e., such a substitution] would render meaningless the structure of the Bankruptcy Code and Rules which contain provisions requiring *both* approval of employment *and* after the fact approval of compensation. 11 U.S.C. §§ 327(a), 1103(a), 330; Bankruptcy Rules 2014(a) [pertaining to disclosure requirements imposed on trustee or debtor-in-possession seeking § 327 approval], 2016 [pertaining to application for compensation from the estate under § 330], 2017 [pertaining to bankruptcy court's examination under § 329 of payments made by debtor to attorney]."[12] This concept was best expressed by the court writing in *In re Johns–Manville Corp.,* 32 B.R. 728 (S.D.N.Y.1983): "The fact that the Bankruptcy Court, in the later Section 330 proceeding, may choose to award no fees to the five law firms for the services rendered means that the Section 327 approvals are merely preliminary 'go aheads' rather than conclusive determinations." *Id.* at 731.

To accept Hantman's claim that § 327 approval creates a legal entitlement to payment from estate funds would be to subvert the clear and express intent of § 330. That section of the Code requires a finding of "benefit-to-the-estate" before estate compensation may be paid to appointed special counsel. This two-step process—i.e., appointment under § 327 and then compensation under § 330, if and only if, "benefit-to-the-estate" is found—was adopted by Congress to eliminate "abuses and detrimental practices" attributable to "attorney control of bankruptcy cases."[13] Such a policy, moreover, comports

---

9. 11 U.S.C. § 330 (emphasis added).

10. The 1994 amendments to § 330, which require benefit to the estate before compensation may be awarded from the estate, codified the standard already established by caselaw.

11. Section 329(a) provides that "[a]ny attorney representing a debtor in a case under this title, or in connection with such a case, *whether or not such attorney applies for compensation under this title,* shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation." Section 329(b) provides, in pertinent part, that "[i]f such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive...." 11 U.S.C. § 329 (emphasis added).

12. In *In re Arkansas,* 798 F.2d 645 (3d Cir.1986), an attorney had failed to obtain court approval of its employment as Committee counsel. Upon discovering this failure, it applied for *nunc pro tunc* approval after some thirteen months of acting as such counsel. This court allowed for the possibility of *nunc pro tunc* approval, but only in exceptional circumstances, which it did not find in the *Arkansas* case. Hence, it rejected counsel's application for *nunc pro tunc* approval, and in doing so, also rejected the argument that after-the-fact control over special counsel's compensation could remedy the failure of counsel to seek timely approval.

13. *Arkansas,* 798 F.2d at 649. The close communication between Wasserman and Hantman regarding the subject of Hantman's employment by Engel, which is reflected in Hantman's fee application and noted in the Appendix to this opinion, coupled with Hantman's questionable claims that he was never alerted to the warnings given by the bankruptcy court, demonstrates the wisdom of the Congressional policy.

with the purposes of allowing the bankruptcy court the broad power under § 329, *see* n. 11 *supra*, to review payments made by debtors to attorneys, even when those payments are made prior to the filing of a bankruptcy petition. The Revision Notes and Legislative Reports to § 329 explain that "Payments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny."

■ The scrutiny mandated by § 329 is stricter still under § 330. The attorney—such as Hantman—whose employment is approved under § 327 and who seeks fees from the estate under § 330 *must show that his services were necessary and benefited the estate, see* n. 10 *supra*, despite the approval of his retention under § 327(e). *See In re Arkansas, supra; In re Johns–Manville, supra.*

Indeed, although Hantman argues on appeal that the issue of whether his services were in the interest of the estate was decided when he was approved as special counsel under § 327, in the proceedings before the bankruptcy and district courts, members of the Wasserman firm *agreed* that the question of whether Hantman's services actually benefited the estate would ultimately determine the issue of compensation from the estate.

Thus, at the June 5, 1995 hearing on disgorgement of Hantman's $30,000 retainer, in district court, Wasserman conceded that the initial § 327 approval did not guarantee that Hantman would be paid from the estate: "We are not arguing before you this morning that [the bankruptcy judge] might not, at some point in the proceedings, have the power and the jurisdiction to say that the $30,000

retainer should be disgorged should he find that the retention was inappropriate *or that the services performed were not in the best interest of the estate.*"[14] As Wasserman further explained to the district court, Hantman had just filed his interim fee application with the bankruptcy court, and that court would "have an opportunity then, to pass upon the work performed and make a determination with respect to what *I believe is the only real issue, and that is, best interests of the estate.*"[15]

In a similar vein, Wasserman's brief in opposition to the motion to disgorge the $30,000 retainer explained that the bankruptcy court had made plain that the ultimate decision on entitlement to fees from the estate would not be made until later in the case: "In ruling on the initial objection raised by Alvarez to the retention of special criminal counsel, *this Court made clear that, as with the retention of any counsel, the ultimate issue of the allowance of fees are [sic] reserved by the Court until the conclusion of the case.*"[16] In arguing that Hantman should not be required to return the $30,000 retainer, Wasserman—far from contending that the "best interest" determination had already been made in the court's decision to grant § 327 approval—maintained that the issue of compensation was "not yet ripe for adjudication."[17]

Hantman made a similar argument in support of his motion for reconsideration of the denial of the fee application: "[I]t would be *premature* to enter an order denying Ferrara and Hantman's Fee Application based in part on the assumption that Judge Harris [of the New Jersey Superior Court] will deny the motion for a new trial in the [post-conviction relief] criminal case."[18]

---

14. R., Tr. of Hr'g, June 5, 1995, at 6 (emphasis added).

15. *Id.* at 7 (emphasis added).

16. R., Ex. 6, at 11 (Brief in Opposition to Motion to Require Ferrara & Hantman to Return Retainer Paid by the Debtor)(emphasis added).

17. *Id.*

18. R., Ex. 3, at 7 (Memorandum of Law in Support of Motion for Reconsideration of Court's

Denial of Ferrara and Hantman's Interim Fee Application)(emphasis added).

Indeed, § 330(a)(4) as amended in 1994 may have anticipated such occasions in prohibiting payment from estate funds unless services were "reasonably likely to benefit the debtor's estate." Section 330(a)(4) provides in pertinent part: "[T]he court shall not allow compensation for ... services that were not ... **reasonably likely to benefit the debtor's estate.**" 11 U.S.C. § 330(a)(4)(A)(1994)(emphasis added).

Thus, the argument urged upon the bankruptcy court by Hantman at that point was not that it had been determined once and for all that the estate had been benefited at the time of the order granting Hantman § 327 approval, and that Hantman would be paid from the estate. Rather, Hantman was contending that the bankruptcy court did not yet have enough information regarding the outcome of the criminal case to deny fees.

■ In the instant case, the bankruptcy court was clearly correct in holding that Hantman, regardless of how he was to be paid, required § .327 approval before he could be employed by Engel as debtor-in-possession, and in holding that fees could not be awarded pursuant to § 330, absent a showing of benefit to the estate. In fact, the bankruptcy court specifically referred to our *Arkansas* decision in explaining the necessity of § 327 approval before Hantman could perform *any* services on Engel's behalf:

> I felt—and in case it's not clear on the record, and I think it is, and I—in every hearing that this issue has come up. But I have felt that it was inappropriate to use estate funds to defend or to affirmatively try to prove a—a criminal matter. And yet I have consistently said, look, to the extent that Section 327, and following, of the Bankruptcy Code, says you can't do any work without being authorized. And I think there's good law that that is at least to be considered in—in *Arkansas*—the *Arkansas* case. To that extent, I'll allow them to work. I'm just not going to allow them the money.[19]

Questions as to who would pay Hantman—Engel individually[20] or the estate—how much Hantman would be paid, and when, were appropriately deferred by the bankruptcy

court until Hantman's fee application was reviewed. We hold that the bankruptcy court did not err in holding that § 327 approval established *only* that Engel was permitted to retain Hantman, and not that Hantman would be paid from estate funds for criminal defense services to be provided to Engel.

### B.

Thus, Hantman cannot successfully maintain that the denial of his fee application under § 330 was inconsistent with his retention as special counsel under § 327. Nor can he contend that the bankruptcy court's finding that Hantman's services had provided no benefit to the estate, was clearly erroneous.

### 1.

■ First, we reject Hantman's argument that the bankruptcy court's denial of compensation under § 330 was inconsistent with the § 327 order approving his retention. Apart from the fact that reexamination of Hantman's services for "benefit-to-the-estate" was required under § 330, the bankruptcy court made clear that it was not, in denying fees under § 330, also revoking its § 327 order of retention.[21]

■ The circumstances under which the bankruptcy court approved of Hantman's retention, in addition, reveal that the May 17, 1994 order was well within the discretion of the court, even though the court might later deny an application for fees under § 330. The bankruptcy court had been advised by Wasserman and Hantman that there were sufficient funds to pay all Engel's creditors and obligations, including the fees to be

---

19. R., Ex. 1, 1–H, Tr. of Proceedings, Apr. 6, 1995, at 21.

20. At the time Hantman sought to be retained, the amount of Engel's liability to the estate of Alvarez had yet to be determined. Hence, although the fact of liability had been established, it was not yet known how much of Engel's bankruptcy estate might be exposed to the wrongful death judgment. Indeed, Hantman himself—and Wasserman, who prepared and presented Engel's application for retention of Hantman—rep-

resented then and later that Engel himself had ample funds to discharge all obligations. *See* text *infra,* and n. 22.

21. Thus, during the October 13, 1994 hearing on the disgorgement of the $30,000 retainer, Wasserman asked, "Is the Court reversing the Order of Retention?" The bankruptcy court responded, "No. The Order of Retention says he can do the work. The Order of Retention says he makes an application when it's all done." J.A. 127.

sought by Hantman.[22] Under the circumstances of this case the action of the bankruptcy court did not exceed its discretion.

### 2.

■ Second, the bankruptcy court did not clearly err in finding that Hantman's services in Engel's criminal case produced no benefit to the estate.[23]

On March 15, 1996, Judge Harris denied Engel's motion for a new trial, as well as his untimely petition for postconviction relief, in terms that show that there had never been any chance of post-conviction relief.[24] The issue of "benefit-to-the-estate" has thus been put to rest. The view that Engel would obtain a new trial, given Judge Harris's decision, was obviously fanciful:

> [B]ecause both *Brady* [*v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] and *Strickland* [*v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)] analyses inquire into probable effects on trial outcomes, I begin by emphasizing this conclusion: my complete reading of the record ... demonstrates that Engel faced overwhelming evidence of guilt.[25]

The court concluded that "Engel received a superior defense in a trial environment that scrupulously honored his rights."[26] The bankruptcy court properly anticipated such a result in finding that Hantman's services in the criminal matter had not benefited the estate.

Nor did the bankruptcy court reach its conclusion, that Hantman was not entitled to estate monies, casually. In its December opinions the court carefully and meticulously analyzed the three-part standard which evolved from *In re Duque*, 48 B.R. 965 (S.D.Fla.1984), *In re French*, 139 B.R. 485 (Bankr.D.S.D.1992), and *In re United Church of the Ministers of God*, 84 B.R. 50 (Bankr.E.D.Pa.1988), before holding that the services of Hantman in representing Engel as criminal counsel, did not benefit the estate.

The standard to which the bankruptcy court referred, provided:

1. The attorney's employment must be in the best interest of the estate, which means property of estate is threatened and the need for services is real. Employment cannot be based on some 'hypothetical or speculative benefit.'

2. Special counsel must provide a benefit to the estate, not merely a personal benefit to the debtor. The benefit is gauged by needs of estate and whether it is directly related to the debtor in possession's performance of duties under the bankruptcy code.

3. Issues regarding debtor's constitutional right to counsel are of concern to the criminal forum and not the bankruptcy court.

Application of that standard to Engel's situation led inexorably to the bankruptcy court's

> In the instant case, it is clear that there was neither actual benefit to the estate, nor a reasonable likelihood of benefit to the estate, to be gained by criminal defense services provided by Hantman to Engel.

---

**22.** Hantman has maintained consistently that the estate will be sufficient to pay all its obligations, and that payment of his fees will have no adverse impact on the creditors. *See*, e.g., his Certification of Oct. 10, 1995, at J.A. 52.

**23.** The issue of when that benefit should be measured, i.e., after the services have been performed or at the time they are undertaken, need not concern us in this case. Section 330, as amended in 1994, provides that services, in order to be compensable from the estate, must be "reasonably likely to benefit the estate." 11 U.S.C. § 330(a)(4)(A)(ii)(I). Cases have held that services, to be compensated from the estate, must have provided *actual* benefit to the estate. *See*, e.g., *Rubner & Kutner, P.C. v. United States Trustee (In re Lederman Enter. Inc.)*, 997 F.2d 1321 (10th Cir.1993); *Canatella v. Towers (In re Alcala)*, 918 F.2d 99 (9th Cir.1990).

**24.** *State v. Engel*, Order and Opinion, Indictment No. S–570–85–01 (N.J.Super. Ct. Law Div., March 15, 1996).

> As Judge Harris noted, "Engel filed his petition for post-conviction relief almost nine years after the judgment of conviction"—four years after the deadline for filing. *Id.* at 46–47.

**25.** *Id.* at 2.

**26.** *Id.* at 51.

denial of Hantman's fee application.[27]

The bankruptcy court's finding that Hantman's services did not benefit the estate, in short, was not clearly erroneous.

## III.

 Hantman argues that he was not warned at any time prior to the May 17, 1994 retention order that the bankruptcy court would not allow payment from the bankruptcy estate for the criminal defense services he was providing to Engel, and that he has suffered harm as a consequence. He argues that he had been given no effective notice of the court's reservations concerning payment from estate funds, and that the equities of the situation thus require that he be paid from the estate.

Hantman made this argument before both the bankruptcy and district courts. Both courts rejected this argument, as do we.

At the outset, we observe that the denial of fees by the bankruptcy court was correct: the bankruptcy judge did not have the authority to disregard the "benefit-to-the-estate" requirement of § 330. Thus, as the bankruptcy court responded to Hantman, "I am sympathetic to your plight, but I am bound by the law."[28]

Even if we were to assume that the Bankruptcy Code permitted the bankruptcy court to take account of Hantman's arguments of reliance and prejudice, we could not, on this record, hold that the bankruptcy court abused its discretion in rejecting those arguments.

To begin with, it was not unreasonable for the bankruptcy court to conclude, as it did, that Hantman had received effective notice that estate funds would not pay for criminal defense services which did not benefit the estate. No one disputes that such a warning was issued in the course of the March 21, 1994 colloquy, and the bankruptcy court specifically recalled giving still another warning in the May 16, 1994 telephone conference:

> This Court held a telephonic hearing on the objection of the estate of Ciamara [sic] Engel on May 16, 1994. The Court stated that Ferrara & Hantman could not be paid from estate funds. The Court entered an order which held that the debtor could retain special counsel, but, and I quote, "Compensation for such special counsel shall be determined by this Court upon proper application."[29]

In the opinion which he filed on December 20, 1995, the bankruptcy judge repeated that "[t]his court held a telephonic hearing on the objection of the Estate of Xiomara Alvarez on May 16, 1994. The court stated that F & H could not be paid from estate funds."[30] Attorney Nicolette, who represented the Administrator of Xiomara's estate, supported the judge's recollection fully, although Yablonsky of the Wasserman firm did not recall the court's statement.[31]

Hantman claims that the May 17, 1994 retention order was imprecise and ambiguous. Even if we were to agree, and we do not, we would not accept Hantman's assertion that because of an imprecision in an order of the bankruptcy court, he should be paid from estate funds. To accept his claim would be to ignore *Zolfo Cooper & Co. v. Sunbeam–Oster Co.*, 50 F.3d 253 (3d Cir. 1995), in which we held that the burden rests "on the applicant[for fees] to ensure that the court notes explicitly the terms and conditions if the applicant expects them to be established at that early point." We stated

---

27. The bankruptcy court explained that Engel's criminal conviction had been extensively reviewed through and including the Supreme Court of New Jersey; that before any benefit could possibly accrue to the bankruptcy estate, Engel's criminal conviction would have to be overturned; Engel would then have to be acquitted at a new criminal trial and the civil judgment against him would also have to be overturned. Finally, the bankruptcy court applied the *Duque* analysis and determined that employing criminal counsel for Engel was not in the best interest of the estate, concluding, "[s]uch a determination is an extremely fact sensitive decision and is one that is within the discretion of the bankruptcy court." Op. Bankruptcy Ct., Dec. 20, 1995 (Appellant's Br. at A14).

28. J.A. 169.

29. J.A. 202.

30. J.A. 19.

31. J.A. 71.

that an order that refers to documents supplied in support of the application for retention does not implicitly adopt any terms set forth in the supporting documents, and that the court is not bound to "particular terms and conditions of compensation" unless those terms are explicitly stated in the relevant order.[32]

Even if the bankruptcy court could ignore the express mandate of "benefit-to-the-estate" imposed by § 330, and thereby give credit to Hantman's claim of prejudice, it was not unreasonable for the bankruptcy court to infer, despite the fact that Hantman was neither present at the March 21, 1994 discussion, nor a party to the May 16, 1994 conference call, that Wasserman attorneys—who were acting as Hantman's *de facto* representatives—were informing Hantman of all relevant developments concerning his proposed retention by Engel.

Indeed, Hantman's detailed fee application shows that he engaged frequently in telephone and written correspondence with Wasserman attorneys on the very subject of retention, and that one of these calls took place on March 22, 1994, the day after the first warning was given.[33] His application also shows that on April 19, 1994, he reviewed the objections that Nicolette had made in a letter of April 14, a letter containing an explicit reminder of the March 21 warning.

Hantman thus had direct access to at least one document which reflected the bankruptcy court's March 21, 1994 warning, and considerable contact with the attorneys who were representing his interests, and who were present when those warnings were issued. Under these circumstances, we would be hard-pressed to conclude that the bankruptcy court abused its discretion in rejecting Hantman's claim that he should be paid under § 330 because he had not received effective notice of the bankruptcy court's warnings.

Finally, we note that although Hantman's § 330 fee application was properly denied, our affirmance of the district court's order of April 17, 1996 does not impact on any claim Hantman may make against Engel's personal funds, as distinct from estate funds. Although he has labored in a losing cause, when viewed through the lens of the New Jersey Superior Court Judge who denied Engel's petition for post-conviction relief, Hantman can still look to Engel—though not to the estate—for payment.[34]

We hold that the bankruptcy court did not abuse its discretion in denying Hantman's fee application.

## IV.

Judge McKee's thoughtful dissent charges us with having given no consideration to Hantman's reliance on the bankruptcy court's order of May 17, 1994. He is also persuaded by Hantman's argument that the bankruptcy court revoked its May 17th order when it denied Hantman's compensation, some sixteen (16) months later. Judge

---

**32.** *Zolfo,* 50 F.3d at 262 (emphasis added).

**33.** From February 23, 1994 through May 13, 1994, Hantman's fee application reveals numerous telephone conversations with Yablonsky concerning retention and the terms of retention:

| | |
|---|---|
| 2/23/94 | (telephone conference with Yablonsky) |
| 2/24/94 | (telephone conference with Yablonsky) |
| 2/26/94 | (review of letter from Yablonsky) |
| 3/3/94 | (telephone conference with Yablonsky) |
| 3/7/94 | (letter to Yablonsky) |
| 3/15/94 | (telephone conference with Yablonsky) |
| 3/22/94 | (telephone conference with Yablonsky) |
| 3/28/94 | (telephone conference with Yablonsky) |
| 3/29/94 | (telephone conference with Yablonsky) |
| 3/30/94 | (telephone conference with Yablonsky) |
| 4/7/94 | (review of letter from Yablonsky) |
| 4/13/94 | (telephone conference with Yablonsky) |
| 4/19/94 | (review of Nicolette's objections to retention) |
| 4/22/94 | (review of letter from Yablonsky to bankruptcy court) |
| 4/25/94 | (telephone conference with Yablonsky) |
| 5/9/94 | (review of letter from Yablonsky) |
| 5/12/94 | (review of letter from Yablonsky; telephone conference with Yablonsky) |
| 5/13/94 | (telephone conference with Yablonsky). |

*See also* Appendix to this opinion.

**34.** Thus, Hantman's argument that the rulings of the bankruptcy court have placed him in the position of representing Engel on a contingency basis, in violation of ethical rules, is also misplaced. The bankruptcy court, again, has decided only that Hantman will not be paid from the estate for services that did not benefit the estate. *See* § 330.

McKee finds it "obvious that the bankruptcy court determined that the services Hantman was to offer ... were 'in the best interest of the estate'" and that "Hantman *began* his efforts to seek post-conviction relief pursuant to that determination." Dissent at 582 (emphasis added).

The dissent's arguments, however, fail to take into account or to explain that Hantman applied for fees for more than one hundred hours of services rendered prior to the entry of the May 17, 1994 order. These services outlined in Hantman's fee application evidence the fact that Hantman did not rely on that order before performing substantial services for Engel. Hantman was working for Engel—without approval—long before the May 17, 1994 order was ever entered.

More importantly, however, the numerous telephone conferences which have been detailed in note 33, *supra,* and in the Appendix to this opinion, establish that Hantman was in constant telephone communication with the Wasserman firm concerning the status of his retention months before the May 17th order was entered.

Those facts, together with Hantman's admitted review of Nicolette's objections to his retention, satisfy us that Hantman's claimed reliance on the May 17th order and Hantman's purported lack of knowledge that he would not be paid from estate funds, cannot carry the day. Certainly, in view of this record, we cannot agree with Judge McKee that the bankruptcy court abused its discretion in denying Hantman's fee application, once it found that Hantman had provided no benefit to the estate—a finding supported by the evidence of record and, thus, not clearly erroneous. Indeed, the dissent offers no explanation as to how Hantman's purported reliance on the May 17th order can trump the unequivocal and express mandate of § 330 that "benefit to the estate" must be

found as a requisite to payment from estate funds.

Finally, the dissent has offered no good reason why analysis should proceed under *Swietlowich v. County of Bucks,* 610 F.2d 1157 (3d Cir.1979), a non-bankruptcy case, rather than under the relevant § 328 of the Bankruptcy Code itself. Section 328(a) allows the court to modify and even deny previously approved terms and conditions of employment "if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions".[35] 11 U.S.C. § 328(a) (West 1993).

Here the bankruptcy court appropriately based the denial of fees on its finding that Hantman's services had not benefited the estate. Thus, there was no reason for the court to engage in a § 328 analysis.

As a matter of Congressional fiat, §§ 328 and 330 operate together even after an attorney has been approved under § 327 to permit the court to alter or deny fees if it is determined that no benefit to the estate resulted from the retention.

## V.

We will affirm the April 17, 1996 order of the district court, which affirmed the December 21, 1995 order of the bankruptcy court denying Hantman's fee application.

### Appendix

The significant events leading to this instant appeal may be enumerated by date as follows:

—January 6, 1994. Engel filed for Chapter 11 bankruptcy.

—February 23, 1994. Hantman had a telephone conference with Daniel J. Yablonsky of Wasserman re: retention.

---

**35.** Section 328(a) provides that the trustee or the debtor in possession (such as Engel)

> with the court's approval may employ ... a professional person under section ... 327 ... on any reasonable terms and conditions of employment ... Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provid-

ed under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a)(West 1993).

—February 24, 1994. Hantman had a telephone conference with Yablonsky re: retention.

—February 26, 1994. Hantman reviewed a letter from Yablonsky re: retention.

—March 3, 1994. Hantman had a telephone conference with Yablonsky re: retention.

—March 7, 1994. Hantman wrote a letter to Yablonsky re: retention.

—March 10, 1994. Hantman wrote to Yablonsky of Wasserman re: retention, and discussing his research into Engel's criminal case.

—March 15, 1994. Hantman had a telephone conference with Yablonsky re: retention.

—March 21, 1994. In a discussion with Engel's attorney, Steven Jurista of Wasserman, Jurista & Stolz, regarding the possibility of approving of Ferrara & Hantman to be employed as special counsel to do criminal work, the bankruptcy court cautioned that criminal services would not be payable out of the estate.

—March 22, 1994. Hantman had a telephone conference with Yablonsky re: retention.

—March 28, 1994. Hantman had a telephone conference with Yablonsky re: retention, and a 40 minute conference with Engel to "discuss case.".

—March 29, 1994. Hantman had a 24 minute telephone conference with Yablonsky re: retention.

—March 30, 1994. Hantman had another 24 minute telephone conference with Yablonsky re: retention.

—April 7, 1994. Hantman reviewed a letter from Yablonsky re: retention.

—April 13, 1994. Engel, through Wasserman, applied under 11 U.S.C. § 327 to retain Ferrara & Hantman. Hantman had a telephone conference with Yablonsky re: retention.

—April 14, 1994. David A. Nicolette, attorney for the Alvarez estate, wrote to the bankruptcy court to object to Hantman's proposed retention on ground that criminal services were not in the interest of the estate, and to remind the court of its March 21, 1994, caution to that effect.

—April 19, 1994. Hantman reviewed Nicolette's objections to retention.

—April 22, 1994. Hantman reviewed a letter from Yablonsky to the bankruptcy court.

—April 25, 1994. Hantman had a telephone conference with Yablonsky re: status of his retention.

—May 9, 1994. Hantman reviewed a letter from Yablonsky re: retention.

—May 12, 1994. Hantman reviewed a letter from Yablonsky re: retention, and Hantman had a telephone conference with Yablonsky on the same subject.

—May 13, 1994. Hantman had a telephone conference with Yablonsky re: retention.

—May 16, 1994. Telephone hearing with Yablonsky of the Wasserman firm and Nicolette, attorney for Alvarez, at which the bankruptcy court warned that payment for criminal defense funds was not payable from the estate.

—May 17, 1994. Order approved of retention of Ferrara & Hantman as special counsel, providing that "compensation to such special counsel shall be determined by this [bankruptcy] Court upon proper application."

—May 27, 1994. Engel paid $30,000 retainer to Ferrara & Hantman from estate funds.

—October 13, 1994. Hearing on motion by Alvarez to disgorge retainer. At this hearing, which occurred after Engel's liability for Alvarez's wrongful death had been established, Wasserman maintained that the estate had sufficient funds to pay all creditors. However, the court would not allow payment of counsel fees in the criminal matter as an administrative priority.

—October 31, 1994. Bankruptcy court ordered disgorgement and repayment of $30,000.

—May 31, 1995. First interim fee application of Ferrara & Hantman.

—June 5, 1995. The district court affirmed the bankruptcy court's order re-

quiring disgorgement of $30,000 by Hantman.

—June 28, 1995. The United States Trustee objected to that portion of fee application seeking reimbursement for services provided before May 17, 1994 approval of retention.

Denial of fee application in its entirety mooted objection.

—July, 1995. Engel's liability in wrongful death action established at $5.154 million.

—September 6, 1995. Hearing on fee application of May 31, 1995 before bankruptcy court, at which the court emphasized that only services that benefit the estate, as opposed to services that benefit Engel personally, are compensable from the estate. The judge noted that in the telephone conference of May 16, 1994 he had warned that the estate would not pay for services performed in the criminal case. In considering a motion to appoint a trustee in place of debtor-in-possession Engel, the judge expressed the belief that Engel was squandering estate monies. At this hearing Wasserman again represented that the estate would be able to pay all creditors.

—December 20, 1995. Opinions filed on denial of fee application, and on motion for reconsideration. The bankruptcy court observed that it had given early and consistent warnings that criminal defense services were not compensable from the estate.

BECKER, Circuit Judge, concurring.

Judge Garth has written an incisive and, I believe, ultimately correct opinion, in which I join. I do not, however, believe that the result is as clear as Judge Garth believes it to be, a fact that strongly counsels that Bankruptcy Judges should, as a matter of fundamental fairness, explicitly warn persons whose retention is authorized under § 327(e) of the risk that they will not be compensated if they do not produce a benefit to the estate. I write separately to advance this view.

Hantman's argument proceeds from the premise that when the Bankruptcy Court authorized his appointment, knowing full well his purpose (to attempt to set aside Engel's criminal conviction), it impliedly found Hantman's services to be in the best interest of the estate (because the conviction supported the civil judgment against him, and that judgment was a debt of the estate). That seems to me to be a reasonable conclusion.[1] Unlike Judge Garth, I do not find that the final paragraph of the May 17 order made clear the risk inherent in the appointment. Rather, I find the order ambiguous, and believe that the October 13 proceedings underscore the ambiguity as I demonstrate in the margin.[2]

---

1. More precisely, in order to allow Hantman's appointment, the court must have found that the representation was "in the best interest of the estate." 11 U.S.C. § 327(e). By allowing the appointment, then, the court seems to have found that Hantman's services were "reasonably likely to benefit the debtor's estate," a finding necessary for the court to allow compensation of an attorney appointed pursuant to § 327(e). *Id.* § 330(a)(4)(A)(ii)(I). (The cited provision of § 330 was added after the events that gave rise to this case. However, the consensus is that the provision is merely a codification of existing judicial practice and precedent.)

2. See for example, the exchange between Nicolette, the Administrator's counsel, and the Bankruptcy Court. When Nicolette suggested to the court that it had indicated that Hantman's compensation would come only from Engel personally, the bankruptcy court referred to the order itself.

Mr. Nicolette: Your Honor, I think that under the circumstances here, Your Honor specifically stating when we had the application and the hearing on the motion, that he could not be paid from the assets of the estate.
The Court: What does the order say?
Mr. Nicolette: The order is ambiguous.
The Court: What does the order—the order is ambiguous.
Mr. Nicolette: The order says he will come back and file an application.
The Court: Application. Yes. And I'll make a determination then.
J.A. at 121. Perhaps the court was merely repeating or questioning Nicolette's statement. However moments earlier Wasserman had argued as follows:
Mr. Wasserman: Your Honor, Mr. Hantman believed, as did we believe, that your order encompassed an approval of the retention arrangements.... He believed that the payment of the $30,000 retainer was appropriate. He

By my concurrence in Judge Garth's opinion, I acknowledge that, ambiguity *vel non*, Hantman had to overcome the second hurdle of establishing a benefit to the estate pursuant to § 330. I also note that I doubt that the equities here favor Hantman; indeed, I suspect that any fact finding would result in a conclusion that, during his many conversations with Wasserman, Hantman was alerted to the risk that he would not be paid from the estate. I also believe that the likelihood that Hantman would be paid in any event (given the size of Engel's assets) was his strongest motivating factor. Finally, Hantman knew by October 7, 1994, when the motion for disgorgement was filed, that the § 327(e) appointment might be insufficient to entitle him to fees without proof of benefit, and, in continuing his representation, incurred those additional costs at his own risk. All that said, the institutional fairness problem that will affect future cases governed by our precedent here looms large for me.

What is basically at issue is whether the Bankruptcy Judge should be required to make the determination that a professional's services will benefit or likely benefit the estate (*see supra* n. 1) before or after those services have been rendered. Requiring a precedential finding *ex ante* is much fairer to the appointee, but it probably puts undue pressure on the Bankruptcy Judge at a time when the bankruptcy case is new and there may be neither the time nor an adequate record for an informed judgment. Section 327(e) orders are, I understand, often signed on prepared forms without much colloquy or deliberation. Thus, as a matter of policy, *ex post* determination would seem preferable. Such policy considerations support Judge Garth's position.[3]

Notwithstanding this analysis, an explicit alert to the appointees seems in order. Special purpose appointees under § 327(e) will often be individuals with no prior experience in the bankruptcy courts and with no familiarity with the practices and culture of the bankruptcy bar. They may end up investing a huge amount of time on their appointed rounds, only to be denied compensation. In my view, it is only fair for the bankruptcy judge, upon making a special purpose appointment under § 327(e), to make clear to the appointee the risks of non-payment or reduced payment if it later determines that the estate did not benefit.[4]

With these observations, I concur in Judge Garth's opinion and in the judgment of the court.

McKEE, Circuit Judge, dissenting.

has performed tirelessly in pursuing and is about to file the motion for post-conviction relief. I personally believe that he had a right to rely upon the fact that he thought it was appropriate.... He's performed the services.

\* \* \*

But the one argument I can make is that the interpretation of the Code by case law is that this kind of retention and the payment of this kind of special counsel is appropriate where the relief being sought would be in the best interest of the estate. And I submit to your Honor that it's unquestionable that if this conviction were overturned it would certainly be in the best interest of the Debtor's estate. And I think to argue about whether at this point he should have to disgorge and then make an application for services already rendered and then have Your Honor rule on that application when he's about to file the motion that has been based upon hundreds of hours of preparation in an estate where there's going to be a $7 million gross would be inequitable.
J.A. at 116–118. Nicolette's rejoinder included an attempted analogy to *In re United Church of the Ministers of God*, 84 B.R. 50 (Bankr.E.D.Pa.

1988), wherein an attorney's unethical conduct was a factor in denying compensation from a convicted murder's bankrupt estate. The court here appeared to reject the rejoinder. The court stated: "I'm not so sure that Mr. Wasserman's argument is wrong. *There's a certain amount of ambiguity in the Order of the Court,* and there is no question but that there was no unethical action here [as there had been by the attorney representing Heidnik in *Church of Ministers of God*]." J.A. at 119 (emphasis added).

3. So too does the language of 11 U.S.C. § 328(a), which gives the Bankruptcy Judge power to allow compensation different from the compensation decreed under § 327 if the terms and conditions of the appointment proved to have been improvident in light of developments not anticipated at the time of the fixing of such terms and conditions. This provision, incidentally, does not apply to all appointments but it does apply to appointments under § 327, further supporting Judge Garth.

4. Indeed, the phraseology in § 330(a)(4) "likely to benefit the estate," which suggests a prospective determination, seems to counsel that result.

I agree with my colleagues that Hantman's authorization to act as special counsel pursuant to 11 U.S.C. § 327(e) does not establish special counsel's absolute right to be paid from the bankrupt's estate under 11 U.S.C. § 330(a). I also agree with Judge Becker insofar as he asserts that the relationship between § 327(e) and § 330(a) is not as clear as Judge Garth suggests in the majority opinion. However, I can not join the majority because I believe the bankruptcy court improperly denied Hantman all compensation under 11 U.S.C. § 330(a) without any consideration of the extent to which Hantman reasonably relied upon the initial determination under 11 U.S.C. § 327(e) that his services were indeed in the best interests of the estate. In doing so, the court implicitly revoked its previous order authorizing Hantman's employment by the debtor-in-possession without following the equitable analysis required by *Swietlowich v. County of Bucks*, 610 F.2d 1157 (3d Cir.1979). Therefore, I respectfully dissent.

## I.

At the outset, it is apparent that my colleagues and I agree that the bankruptcy court authorized Hantman's retention to represent Engel, the debtor-in-possession,[1] under § 327(e), and not some other provision of the Code. That section of the Bankruptcy Code provides:

> The trustee, with the court's approval, may employ, *for a specified special purpose, other than to represent the trustee in conducting the case,* an attorney *that has represented the debtor,* if *in the best interest of the estate,* and if such attorney does not represent or hold any interest adverse to

the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e)(emphasis added). It is also apparent that Hantman's special purpose in being employed was to attempt to obtain post-conviction relief for Engel.[2] I think it obvious that the bankruptcy court determined that the services Hantman was to offer the debtor-in-possession were "in the best interest of the estate." Hantman began his efforts to seek post-conviction relief pursuant to that determination.

Nevertheless, sixteen months after the bankruptcy court authorized Engel to employ Hantman to seek postconviction relief, the bankruptcy court denied Hantman all compensation for the services it had authorized. In doing so, the bankruptcy court confused the analysis required in the first instance under § 327(e) with the analysis required when special counsel employed pursuant to § 327(e) seeks compensation under § 330(a) after having performed the services for which he or she was employed. Indeed, the bankruptcy court's initial opinion denying Hantman any compensation was grounded in a discussion of *In re Duque*, 48 B.R. 965 (S.D.Fla.1984), which is the leading case discussing the standards for the retention of special criminal counsel under § 327(e). However, *Duque* has absolutely nothing to say about compensation of special criminal counsel after an appointment under § 327(e). That court's analysis was limited to determining whether special counsel should be authorized in the first instance if counsel's only purpose was to seek post-conviction relief. It is obvious to me that the bankruptcy court could have refused to authorize Hant-

---

**1.** Engel was a debtor-in-possession when he sought court approval to retain Hantman. A debtor in possession has the same power to employ professionals under § 327 as the trustee. 11 U.S.C. § 1107(a); *see also United States Trustee v. Price Waterhouse*, 19 F.3d 138, 141 (3d Cir.1994).

**2.** The conclusion that Hantman was retained to obtain post-conviction relief is apparent from the record. *See, e.g.,* ¶¶ 3, 4, 5, and 9 of Engel's § 327(e) application, which state:

> 3. Since his conviction in 1986, the Debtor has actively pursued post-conviction relief in

order to prove his innocence, obtain his freedom and resurrect his life.

> 4. *In order to permit the Debtor to continue pursuing post-conviction and habeas corpus relief, it is essential that special criminal counsel be retained.*

> 5. The Debtor has identified [Hantman] as the [attorney] he wishes to retain to assist him *in pursuing those rights.*

> * * * * * * * * * * * * * * * * * * * * *

> 9. [T]he Debtor ... has the *constitutional right to pursue postconviction and habeas corpus relief. ...*

J.A. at 55–56 (emphasis added).

man's appointment in the first instance under the reasoning of *In re Duque.* However, it did not do that. Rather, it authorized Engel to retain Hantman.

In its initial opinion, the court wrote: "[f]urther and of more significance, debtor easily fails the standard for appointment of criminal counsel." J.A. at 24. But, of course, Hantman had already been appointed. Similarly, in the opinion on the motion for reconsideration, the bankruptcy court wrote: "[t]he employ of criminal counsel was not in the best interest of the estate." J.A. at 14. However, the propriety of Hantman's employment under § 327(e) was not the issue. That issue was resolved sixteen months earlier, on May 17, 1994, when the bankruptcy court authorized Engel to employ Hantman. Or so it appeared.

In denying Hantman any compensation, the vehicle for determining the propriety of compensation to counsel previously appointed under 327(e) was transformed into a vehicle for determining that counsel should not have been appointed. Counsel alleges that, in the interim, he performed services, and incurred expenses that the estate should compensate him for.

Hantman argues that the law of the case doctrine precluded the bankruptcy court from implicitly reversing the May 17 order. Nevertheless, I do disagree with Hantman's argument that the law of the case doctrine precluded the bankruptcy court from implicitly reversing its original order. I believe that the court was precluded from reversing the original order *without further analysis* not because of the law of the case, but because of the interplay between § 327(e) and § 330(a), and the equitable considerations of the peculiar circumstances here.

## II.

In *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983), the Supreme Court noted:

Unlike the more precise requirements of res judicata, law of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision

should continue to govern the same issues in subsequent stages in the same case.

*Id.* The "[l]aw of the case rules have developed 'to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.' " *Casey v. Planned Parenthood of Southeastern Pennsylvania,* 14 F.3d 848, 856 (3d Cir.1994)(quoting CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, 18 FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4478 (2d ed.1981)).

However, the law of the case doctrine does not impose a strait-jacket on the court's ability to reconsider issues previously decided. The doctrine simply "directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California,* 460 U.S. at 618, 103 S.Ct. at 1391. Although courts are reluctant to reconsider questions of law that have already been decided in the same proceeding, "it is clear that all federal courts retain power to reconsider if they wish." CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, 18 FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4478 (2d ed.1981).In Justice Holmes' famous formulation, the law of the case doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messenger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912).

Perhaps because of the "amorphous" nature of the doctrine of law of the case, no single pronouncement of its limitations has evolved. For example, we have stated "[t]he law of the case doctrine does not preclude a trial judge from clarifying or correcting an earlier ambiguous ruling." *Fagan v. City of Vineland,* 22 F.3d 1283, 1290 (3d Cir.1994). However, ambiguity is not a condition precedent to a court's ability to exercise its discretion to reconsider a prior decision. We have also held:

a trial judge has the discretion to reconsider an issue and should exercise that discretion whenever it appears that a previous ruling, even if unambiguous, might lead to an unjust result.

*Swietlowich v. County of Bucks,* 610 F.2d 1157, 1164 (3d Cir.1979). The Supreme Court has also suggested that a court's ability to reconsider a prior ruling is related to a need to eliminate an unjust result. In *Arizona v. California,* the Court stated:

> Under the law of the case doctrine, as now most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work manifest injustice.

460 U.S. at 619 n. 8, 103 S.Ct. at 1391 n. 8. Similarly, in *Al Tech Specialty Steel Corp. v. Allegheny International Credit Corporation,,* we listed three "exceptional circumstances," including preventing an unjust result, that may justify a court's reconsideration of a prior ruling:

> [I]t is appropriate for an appellate court to reconsider a decision made in an earlier appeal in exceptional circumstances, such as where there has been an intervening change in the law, where new evidence has become available, or where reconsideration is necessary to prevent clear error or a manifest injustice.

104 F.3d 601, 605 (3rd Cir.1997).

Although the parameters of the law of the case doctrine are not well defined, it is clear that there are limits on a court's inherent ability to reconsider a prior ruling. In *Fagan v. City of Vineland,* 22 F.3d at 1290, we stated in a different context: "[a]lthough [the law of the case doctrine] does not limit the power of trial judges from reconsidering issues previously decided by a predecessor judge from the same court . . . it does recognize that . . . a successor judge should not lightly overturn decisions of his predecessors in a given case." This applies with equal force to earlier rulings of the same judge in the same case.

In *Swietlowich,* we identified two prudential considerations that limit a court's authority to reconsider a prior ruling. First, the reasons for the change should be stated on the record. 610 F.2d at 1164. This requirement allows for meaningful appellate review. Here, the court did state its reasons for implicitly reversing its May 17 order on the record. That reason (that the services were not in the best interest of the estate) would clearly have been sufficient to justify a decision not to authorize Hantman's appointment when Engel first petitioned for permission to do so.

However, under *Swietlowich,* the court "must . . . take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling." *Id.* Under this second requirement, the court must consider any prejudice that may result from reconsidering a prior order because of possible injustice to one who may have relied upon that order. We have continued to rely upon *Swietlowich,* even after the Supreme Court's subsequent pronouncements on the law of the case in *Arizona v. California. See Fagan,* 22 F.3d at 1290. Accordingly, I believe the bankruptcy court should have engaged in the equitable analysis set forth in *Swietlowich,* before denying Hantman any compensation or reimbursement under § 330(a).[3]

---

**3.** *Swietlowich* is not a bankruptcy case and it can therefore be argued that its equitable analysis ought not to control an inquiry under § 330(a) absent some indication that Congress intended equitable principles to guide an inquiry under that section of the Code. However, we have previously recognized that principles of equity can guide a court's discretion under the Code. In *In Re Arkansas,* 798 F.2d 645 (3d Cir.1986), we considered whether a bankruptcy court has the authority under the Code to grant retroactive approval of the employment of an attorney by a creditors committee, and if so "what standard should govern the grant of retroactive approval?" *Id.* The dispute there arose after the Committee of unsecured creditors recommended that a law firm ("B & S") be employed as the Committee's counsel. However, through its own admitted oversight, B & S never returned the required affidavit certifying its retention, and it never filed an application for court approval of its employment on behalf of the Committee. Thirteen months after it began rendering legal services for the Committee, B & S discovered the oversight and promptly sought retroactive approval of the bankruptcy court. The only justification it gave for not seeking such approval before doing the work was "inadvertence." *Id.* at 646. We noted that the question posed was an open one, and held "retroactive approval of appointment of a professional may be granted by the bankruptcy court in its discretion but that it should grant such approval only under extraordinary circumstances." *Id.* at 650. We then held that the district court correctly concluded that "[i]n this case, . . . the 'equities' simply do not fall in appellant's favor," *id.,* and affirmed the ruling of the district court wherein it had upheld

Hantman argues that he relied on the May 17th order in undertaking his post-conviction efforts, and, therefore, he is entitled to compensation for those services. Thus, the issue is not, as Judge Garth claims, whether compensation from the bankruptcy estate under § 330 and approval under § 327 can be compressed into one step. *See Majority* at 572–573. Nor is the issue whether employment authorized under § 327 is a "go-ahead" rather than a "conclusive determination." *Id.* Instead, I believe the real issue is whether the bankruptcy court properly exercised its discretion under § 330(a) in lieu of any reasonable reliance that Hantman may have placed upon the prior authorization under § 327(e).[4] This issue goes directly to the second prong of *Swietlowich.*

### III.

The parties dispute when Hantman knew, or reasonably should have known, that the bankruptcy court would not allow him any compensation from the debtor's estate. The bankruptcy court relied upon its recollection and interpretation of events preceding Hantman's request for compensation to conclude that Hantman suffered no prejudice from the reversal of the May 17 order because he should have known that he was not to be paid from the assets of the estate. Similarly, the Administrator's counsel claims that debtor's counsel knew early on that the bankruptcy court would not allow any of the estate's assets to be used to pay for special criminal counsel.

When Engel filed his *pro se* voluntary petition under Chapter 11, the Administrator's wrongful death and survival action, which included a pending motion for prejudgment attachment of the monies that Richard Engel was to pay Engel under their settlement agreement, became subject to the automatic stay provisions of the Bankruptcy Code. *See* 11 U.S.C. § 362. The Administrator subsequently filed a motion for relief from the automatic stay and a hearing was

held on the Administrator's motion on March 21, 1994. During that hearing, the bankruptcy court did state:

> This debtor has nothing to lose appealing for the rest of his life, because until he gets out of there, he's there for the rest of his life. So under the circumstances I would anticipate the process of appeals might go on interminably. And of course, the question then becomes whether or not the estate—now speaking of the bankruptcy estate—bears that cost in any way, shape or form. My instinct is that it's like a dischargeability issue. The estate does not pay the legal fees, and they have to be paid from some source outside of estate property.

J.A. at 43. The Administrator argues that this is the first clear indication that Hantman's fee would not be paid from the assets of the debtor's estate, that debtor's counsel was therefore clearly aware of the court's position on the issue, and Hantman cannot now claim he was prejudiced by relying upon the May 17, 1994 order authorizing Engel to retain him.

The Administrator also claims that during the May 16, 1994 conference call the bankruptcy court again stated that Hantman's fee would not be paid from assets of the debtor's estate. David Nicolette, counsel for the Administrator, participated in that conference call and he has filed an affidavit in which he states "the Court allowed the retention but specifically noted that no funds could be used from the estate to pay [Hantman]." J.A. at 234.

Moreover, during the October 13, 1994 hearing on the Administrator's motion to disgorge Hantman's $30,000 retainer, the court indicated that the debtor, and not the debtor's estate, was responsible for Hantman's fee. The court said: "The issue before me— and I thought that this is what was resolved in the telephone conference and if it was not clear in the order then it's my difficulty as

---

the bankruptcy court's denial of retroactive authorization. Thus, it was the equities of a particular situation that guided the court's discretion in deciding whether or not to grant retroactive approval.

4. Accordingly, I am unpersuaded by the numerous cases Judge Garth cites in support of his reading of these statutes as none of those cases turned upon an interpretation of § 327(e). Rather, they were concerned with § 327(a).

well—that if there are funds available, Mr. Engel can pay." J.A. at 115–16. Later in that hearing the court said:

> "I believe that what was intended is that when matters went along, I would take another look at it, and this is without prejudice to a further application. It may very well be—and I don't recall that this was articulated in the telephone conversation; it probably should have been—that if it is of benefit to the estate, under 503, an application can always be made. And that would make it a proper administration expense. But I don't think I ever approved a retainer and I believe that the further argument, the further—not argument—the further application would be looked at not in terms of 330 but in terms of 503 and I therefore must grant the motion to set aside the retainer and direct disgorgement."

J.A. at 126–27.[5]

Finally, on April 6, 1995, during a hearing on a motion to reconsider that portion of the court's February 15 order, which denied Hantman a retainer in connection with his appointment as defense co-counsel in the wrongful death and survival action, the bankruptcy court stated: "I said [Hantman] had the right to represent the debtor but I never agreed in any of that representation that this Court would pay for it—permit the debtor to pay for it from a State (sic) funds." J.A. at 135.

The Administrator relies upon these excerpts to argue that Hantman knew that his fee was to be paid by the debtor, and not his estate, and that Hantman cannot now claim he has been prejudiced by relying upon the May 17 order.

However, Hantman claims that neither debtor's counsel nor the bankruptcy court warned him that he would not be allowed compensation from the debtor's estate. Daniel Yablonsky, counsel for the debtor, participated in the May 16, 1994, conference call. He has filed a certification regarding that call in which he states: "I do not recall any statement by the Court that such fees could not be paid from the Debtor's estate nor that such fees would have to be paid from the Debtor's personal funds." J.A. at 71.

I do not question the veracity of the court or counsel. To its credit, the bankruptcy court very candidly conceded that there was some merit to Hantman's position because of the confusion that resulted from the May 17 order. During the hearing on the motion to disgorge the retainer, debtor's counsel argued that an order approving retention under § 327(e) requires a finding by the court that the proposed retention is in the best interest of the estate. The bankruptcy court responded: "[A]n application was made. A determination was made. There—and I'm not so sure that [debtor's counsel's] argument is wrong." J.A. at 119. Immediately thereafter, the bankruptcy court said: "There's a certain amount of ambiguity in the Order of the Court...." Moreover, after the bankruptcy court suggested that Hantman could make an application for compensation under 11 U.S.C. § 503, debtor's counsel asked whether the court was also revoking the retention order. The court replied:

> No. The Order of Retention says he can do the work. The order of retention says he makes an application when it's all done. When he makes an application, he may be able to make an application under 503. I did not guarantee that I would, under any circumstances,—and I did not make a determination ... that he was entitled to a retainer. I'll reconsider on the issue of any application when he makes it but I believe that it has to be justified under benefit to the estate. That's my view.

J.A. at 127.

Hantman argues that these excerpts show that, while there may have been some confusion about the terms of his employment, he was never told that he would not be compensated from the bankrupt's estate, and the contrary conversations do not negate the determination that his services were a benefit to the estate that was implicit in the May 17

---

5. 11 U.S.C. § 503 allows for administrative expenses. However, that section does not negate consideration of section 330 as 11 U.S.C. § 503(b)(2) specifically allows compensation awarded under section 330(a) as an administrative expense under section 503, and section 330(a) specifically provides for compensation of those persons appointed under section 327.

order. He thus contends that he continued to rely upon that order and authorization and argues the court could not thereafter deny him all compensation for the work he performed in furtherance of his authorized employment under § 327(e).

In its opinion denying Hantman's motion for reconsideration, the bankruptcy court stated that Hantman assumed the risk of non-compensation because he was "warned repeatedly as early as May 17, 1994, that[his] counsel fees were not to be paid out of the bankruptcy estate." J.A. at 15. Although I do not doubt that the bankruptcy court believed that Hantman understood that he had been warned about the risk he would not be compensated at all, even the bankruptcy court agrees that the circumstances surrounding his appointment are ambiguous. While debtor's counsel was aware as early as May 17, 1994, that the bankruptcy court would not allow Hantman's fees to be paid from the debtor's estate, it is undisputed that Hantman was not a party to the telephone conference call on that date. In addition, there is nothing in the record that is before us that establishes that debtor's counsel told Hantman the substance of the bankruptcy court's statements at either the March 21, 1994 or the May 16, 1994 hearings. Judge Garth imputes Yablonsky's knowledge to Hantman, but that is impossible on this record, and it is beyond our appellate function.

Moreover, the transcript of the October 13, 1994, hearing on the retainer disgorgement motion suggests that Hantman was not present either as counsel or as a witness. *See* J.A. at 107–29. In fact, the October 14, 1994, hearing regarding the disgorgement of Hantman's retainer provides little clear guidance on the compensation issue generally. The bankruptcy court's comments were ambiguous at best. One comment is illustrative.

> The issue before me—and I thought that this is what was resolved in the telephone conference and if it was not clear in the order then it's my difficulty as well—that if there are funds available, Mr. Engel can pay. The difficulty here is priority. Is he entitled to $30,000—I think that's the figure, is it not—up front or is he going to

wait in line, even with all of the professionals.

J.A. at 115–116. This comment can be interpreted to mean that Engel must pay for Hantman's services out of his personal funds. The bankruptcy court stated that "Mr. Engel can pay," not that the estate will pay. However, the remainder of the comment indicates that the bankruptcy court would allow compensation out of estate funds. The latter conclusion flows inescapably from the court's reference to "priority".

The ambiguity concerning the source of Hantman's compensation is also evidenced later in the hearing during an exchange between Nicolette, the Administrator's counsel, and the bankruptcy court. When Nicolette suggested to the court that the court indicated that Hantman's compensation would come only from Engel personally, the bankruptcy court referred to the order itself.

> Mr. Nicolette: Your Honor, I think that under the circumstances here, Your Honor specifically stating when we had the application and the hearing on the motion, that he could not be paid from the assets of the estate.
>
> The Court: What does the order say?
>
> Mr. Nicolette: The order is ambiguous.
>
> The Court: What does the order—the order is ambiguous.
>
> Mr. Nicolette: The order says he will come back and file an application.
>
> The Court: Application. Yes. And I'll make a determination then.

J.A. at 120–21. Admittedly, the transcript does not indicate whether the bankruptcy court was simply repeating or questioning Nicolette's statement about the ambiguity. However, moments earlier Wasserman had argued as follows:

> Mr. Wasserman: Your Honor, Mr. Hantman believed, as did we believe, that your order encompassed an approval of the retention arrangements.... He believed that the payment of the $30,000 retainer was appropriate. He has performed tirelessly in pursuing and is about to file the motion for post-conviction relief. I personally believe that he had a right to rely

upon the fact that he thought it was appropriate. . . . He's performed the services.

\* \* \*

But the one argument I can make is that the interpretation of the Code by case law is that this kind of retention and the payment of this kind of special counsel is appropriate where the relief being sought would be in the best interest of the estate. And I submit to your Honor that it's unquestionable that if this conviction were overturned it would certainly be in the best interest of the Debtor's estate. And I think to argue about whether at this point he should have to disgorge and then make an application for services already rendered and then have Your Honor rule on that application when he's about to file the motion that has been based upon hundreds of hours of preparation in an estate where there's going to be a $7 million gross would be inequitable.

J.A. at 115–118. Mr. Nicolette's rejoinder included an attempted analogy to *In re United Church of Ministers of God, supra,* wherein an attorney's unethical conduct was a factor in denying compensation from a convicted murder's bankrupt estate. The court appeared to reject the rejoinder. The court stated: "I am not sure that Mr. Wasserman's argument is wrong. *There's a certain amount of ambiguity in the Order of the Court,* and there is no question but that there was no unethical action here [as there had been by the attorney representing Heidnik in *Church of Ministers of God* ]." J.A. at 119 (emphasis added). This is a clear recognition by the bankruptcy court that the order was ambiguous.

Finally, when the bankruptcy court spoke about whether the May 17, 1994 order allowed compensation, the court seemed to limit its comments to the retainer:

Mr. Wasserman: Your Honor, can I ask for a point of clarification? Is the court reversing the Order of Retention?

The Court: No. . . . I did not make a determination, Mr. Wasserman, that he was entitled to a retainer. I'll reconsider on the issue of any application when he makes it but I believe that it has to be justified under benefit to the estate. That's my view.

J.A. at 127.

Further, as Judge Becker notes, *see* concurring opinion at 22, the May 17, 1994, order authorizing Hantman's retention is itself ambiguous. While that order did mention payment, it mentioned it only insofar as to note that compensation would be determined upon an application. However, the order did reference Hantman's application, which was annexed to the order and which included a fee schedule. In referring to the annexed application, the May 17 order states *"and good cause appearing therefrom* for the making of this Order." The application stated at ¶ 8: "The Debtor respectfully submits that it is completely appropriate to pay both the retainer and the ongoing cost of his post-conviction relief out of property of the estate." I understand that the order may well have been "boilerplate" in form and content and that the court may well have simply signed generic language when acting upon Engel's application. However, that does not void the language of the order. Indeed, we hold parties to the contents of documents, all the time. The language of the May 17 order may well have been ill advised, but that does not make the May 17 order go away, nor render it a legal nullity.

The preceding recitation of the respective positions of the parties concerning whether Hantman knew or should have known is only offered because I believe that there is a legitimate dispute about Hantman's knowledge that his compensation would not come from the estate. I do not think that issue can be decided here, and should be decided only upon remand. In his opinion, Judge Garth appears to conclude that Hantman knew as early as March 21, 1994, that he would not be compensated from estate assets. *See* Majority at 576. Judge Becker, in his concurring opinion, expresses his view, not only that the equities may not favor Hantman, but also that after a proper fact-finding process, Hantman would be found to have known that he was not to be paid from estate funds. *See* Concurring opinion at 581.

Both of my colleagues may well be correct on that score. However, we are not fact-finders. That is the function of the trial court and given what I see is the bankruptcy court's candid concession that there was some arguable merit in Hantman's position, I do not believe that the record, as established so far, conclusively determines as a matter of law when, or if, Hantman had either actual or constructive knowledge that his compensation would not come from the estate. In part IV of the majority opinion, Judge Garth notes that Hantman could not have relied upon the May 17 order because he has billed the estate for representation purportedly undertaken before that date. This is a factor that the bankruptcy judge would consider upon remand, and it is clearly a factor that would weigh heavily against Hantman's position. I do not, however, think that it supports a decision to deny Hantman all compensation (including reimbursement of all expenses) under the rationale used by the bankruptcy court. Absent explanation, the "pre order expenses and compensation" could certainly be deducted from the total fees claimed, and they may even convince the bankruptcy court that Hantman never really relied upon the May 17 order at all. However, that is the analysis that I believe must be performed to support the bankruptcy court's actions. I do not believe that, under these circumstances, the bankruptcy court's actions can be justified by relying upon a *de novo* review of Hantman's section 327(e) appointment using the hindsight refraction purportedly found in section 330(a).

The discussion concerning the ambiguity of the May 17th order is offered not in support of any particular position, but only to demonstrate that there is a legitimate argument that the ambiguity of the order could create the impression that estate funds could be used to pay special counsel. Judge Garth, while not conceding that the order is ambiguous, believes that resolving any ambiguity in Hantman's favor would fly in the face of our decision in *Zolfo Cooper & Co. v. Sunbeam–Oster Co.,* 50 F.3d 253 (3d Cir.1995), which Judge Garth reads as holding that a fee applicant has the burden of resolving any ambiguity in an order. *See Majority* at 576.

I believe that *Zolfo* is distinguishable from the situation here. The issue here is not an ambiguity as to an approved rate of compensation—a proper inquiry under § 330(a)—but the propriety of the initial appointment. Thus, I am not as convinced that *Zolfo* offers us guidance as my colleague is. In any event, we need not reach that question. I do not suggest that the ambiguity be resolved for or against Hantman. I believe that Hantman should be given an opportunity to prove the extent to which he relied upon the May 17 order, that any such reliance was reasonable in view of all of the circumstances surrounding his appointment and representation including, (but certainly not limited to) the May 17, 1994 order.

I cannot conclude that the scrutiny required when special counsel seeks compensation under § 330(a) permits a de novo review of the retention question and an implicit reversal of a prior order under § 327(e) without any equitable analysis. But that is precisely what happened here.

The most appropriate remedy here, and, indeed, the one required under *Swietlowich,* is to remand so that the bankruptcy court can conduct an appropriate inquiry into the degree (if at all) to which Hantman reasonably relied upon the court's May 17th order, and the extent of any prejudice that may have resulted from the court's subsequent implicit reversal of that order. Remand is required by the statute, our case law, and the Congressional policy driving enactment of § 330. In enacting § 330, Congress was concerned that no professional would want to work in the bankruptcy setting, so it included § 330 to ensure that competent professionals would get adequate compensation for services rendered to bankrupts. *In re Busy Beaver,* 19 F.3d 833, 849–50 (3d Cir.1994). Thus, it seems to me that once special counsel is appointed under section 327(e), he or she has a right to proceed under the assumption that his or her professional labors and expenses will be compensated at a reasonable rate to the extent that counsel can establish that the work was performed in a reasonable and professional manner consistent with the factors enumerated in § 330. Those factors allow a reviewing court to ensure that the

time spent, hours billed, and expenses incurred were reasonable, and consistent with the attorney's undertaking to assist the estate. For example, a special counsel appointed under § 327(e) ought not to charge an estate a fee of $2,000 to compensate him or her for trying to recover an asset worth $1,000.

I realize that 11 U.S.C. §§ 330(a)(4)(A)(ii)(I) and (II) preclude a court from authorizing compensation for services that were not "reasonably likely to benefit the debtor's estate; or necessary to the administration of the case", however, I believe those provisions will usually apply more properly to an appointment under § 327(a) where there has been no initial determination that the proposed services will benefit the estate. In the rare situation where special counsel is authorized under § 327(e), and counsel then engages in a course of representation or conduct that is beyond the scope of his or her authorization, that subsection would also operate to limit or prevent compensation from the estate. However, that is not our case, and I cannot conclude that Congress intended § 330(a) to allow for a de novo review of an appointment previously authorized under § 327(e) with no further analysis than occurred here.

I do not suggest that a remand here would mean that Hantman automatically receives every cent that he requested in his fee application. On the contrary, the amount of his compensation will be limited not only by the extent to which he can establish that he reasonably relied upon the May 17th order but also by the criteria set forth in § 330(a). Moreover, to the extent that funds remain after debts of the estate are properly discharged, Hantman may be able to recover some or all of his fees from Engel personally. That would certainly be a relevant consideration of the bankruptcy court in determining to what extent, if any, Hantman will be prejudiced by denying him recovery (in whole or in part) from the bankrupt's estate.

A remand does mean, however, that the original order appointing him under section 327(e) cannot be rendered a nullity by hindsight reconsideration absent an analysis under *Swietlowich.*